IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

SCOTT FRANCIS KEMPKER,

     **Plaintiff,**

v.                                               **Civil Action No. 1:19cv198**
                                                     **(Judge Kleeh)**

UNITED STATES OF AMERICA,

     **Respondent.**

## REPORT AND RECOMMENDATION

### I. Background

On October 25, 2019, the *pro se* Plaintiff, an inmate at FCI Hazelton in Bruceton Mills, West Virginia, initiated this action by filing a Federal Tort Claim Act ("FTCA") complaint. ECF No. 1. Plaintiff was granted permission to proceed as a pauper and satisfied the initial partial filing fee. ECF Nos. 6, 14. On November 19, 2019, attached to a motion for appointed counsel, Plaintiff filed a copy of a November 5, 2019 Administrative Claim denial letter for Administrative Tort TRT-MXR-2019-06646, a lost property claim. ECF No. 9-1. By Order entered November 20, 2019, the motion for appointed counsel was denied. ECF No. 10. On December 10, 2019, Plaintiff filed a letter to the District Judge regarding his filing fee and issues with his case, attaching a copy of a November 8, 2019 email to his Trust Fund Officer and a copy of a November 25, 2019 Administrative Tort Claim acknowledgement letter for claim TRT-MXR-2020-01397, regarding a lost property/personal injury claim. ECF Nos. 12, 12-1, 12-2. On February 28, 2020, Plaintiff filed another letter to the District Judge regarding discovery in the case, attaching copies of thirteen "Affidavit(s) of Truth" from other inmates; a copy of an Inmate Personal Property Record; copies of two emails from Plaintiff to Health Services; copies of statements from two other inmates; a copy of a Release of Information Consent

Form; a copy of a January 7, 2020 Extension of Time for Response – Administrative Remedy; and a copy of an October 18, 2019 Administrative Remedy response from the Administrator, National Inmate Appeals. ECF Nos. 16, 16-1 -- 16-8.

Because it was unclear whether Plaintiff was attempting to also raise <u>Bivens</u> civil rights claims, by Order Notifying Plaintiff of Potential Consequences of Pursuing Both a Federal Tort Claim and <u>Bivens</u> Action issued May 7, 2020, Plaintiff was directed to file a Notification with the Court indicating which action(s) he wished to pursue. ECF No. 20.  On May 14, 2020, Plaintiff filed the Notification, advising that he wished to proceed only with the FTCA action.[1] ECF No. 22.

On August 31, 2020, Plaintiff filed a letter motion to introduce evidence, attaching a copy of a July 8, 2020 letter from the BOP regarding a Freedom of Information Act ("FOIA") request; a photo; and copies of memoranda from various BOP staff. ECF No. 26, 26-1. On October 5, 2020, Plaintiff filed a letter motion to submit medical records into evidence, attaching copies of certain medical records and an administrative remedy. ECF Nos. 27, 27-1 – 27-6.

By Order entered October 6, 2020, the United States was directed to file an answer to the complaint. ECF No. 28. On December 14, 2020, the United States filed a Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, with a memorandum in support, sworn affidavits, and numerous exhibits. ECF No. 35, 36.  Because Plaintiff was proceeding *pro se*, on December 15, 2020, a <u>Roseboro</u> Notice was issued. ECF No. 37. After being granted several extensions of time, Plaintiff filed a response in opposition on May 13, 2021. ECF Nos. 40, 41, 45, 46, 50.

On May 10, 2021, Plaintiff filed a motion seeking a copy of the video evidence of the February 8, 2019 incident. ECF No. 48. By Order entered May 12, 2021, the motion was granted and

---

[1] However, on January 21, 2021, the Clerk docketed a letter from Plaintiff, requesting a <u>Bivens</u> packet; the same was sent to Plaintiff that day. ECF Nos. 43, 44. On February 23, 2021, Plaintiff filed a <u>Bivens</u> action raising the same claims he raises here. <u>See</u> Case No. 5:21cv19.

the Defendant was directed to produce a copy of any existent video of the incident within 14 days. ECF No. 49. On May 14, 2021, in response, Defendant filed a sworn Declaration of Michael Moore. ECF No. 51. On May 24, 2021, Plaintiff filed a Motion for Summary Judgment and Response to Declaration to Michael Moore. ECF No. 53. Plaintiff also filed a Motion for Defendant to Produce a Copy of Policy and Procedure for Video Retainment. ECF No. 54.

On May 27, 2021, Defendant filed a Reply to Plaintiff's response in opposition to its dispositive motion. ECF No. 55. On June 1, 2021, Plaintiff filed a Motion for Discovery. ECF No. 57. On June 4, 2021, without leave of Court, Plaintiff filed a surreply titled "Plaintiff's Reply Memoranda [sic]." ECF No. 57. Defendant filed a Response in Opposition to Plaintiff's summary judgment motion on June 7, 2021. ECF No. 58. Defendant also filed a Motion to Seal Videos.[2] ECF No. 59. By Order entered June 7, 2021, the motion to seal was granted. ECF No. 60. On June 30, 2021, Defendant filed a motion for leave to file exhibit out of time, attaching a copy of Plaintiff's Two-Hour Lieutenant Restraints Check Form. ECF No. 62. By Order entered the same day, the motion was granted. ECF No. 63.

This case is before the undersigned for an initial review pursuant to LR PL P 2.

## II. Factual Background

On November 17, 2017, Plaintiff was sentenced in the United States District Court for the Southern District of Iowa to a 144-month term of incarceration followed by an 8-year term of supervised probation. See SENTRY computerized Public Information Inmate Data, ECF No. 36-1 at 7. Assuming he receives all projected Good Conduct Time ("GCT"), Plaintiff is scheduled for release on June 9, 2027 via GCT Release. Id. at 6.

---

[2] Defendant produced video footage of the debriefing of prison officials after the immediate use of force, and footage of the post-incident medical assessments conducted on Plaintiff and the other inmate involved in the February 8, 2019 incident.

There appears to be no dispute that on February 8, 2019 at approximately 10:30 a.m., Plaintiff and another inmate, Richard Fisher ("Fisher") were in Plaintiff's cell at FCI Hazelton when they "smoked a piece of paper with a chemical on it" and then became unconscious. See Complaint, ECF No. 1-7 at 15. Attached to his complaint, Plaintiff provided a copy of a February 8, 2019 Incident Report charging him with Prohibited Act Code(s) 201, 307, Fighting with Another Inmate, Refusing Order. ECF No. 1-7 at 8. The description of the incident is as follows:

> On February 8, 2019 at approximately 10:28 a.m., staff requested assistance in L-1 unit due to inmates Kempker, Scott . . . and Fisher, Richard . . . displaying erratic behavior consistent with the use of an illicit substance. Upon arrival to cell 232 in L-1 unit, I observed both inmates flailing their arms and screaming. I gave the inmates multiple verbal orders to submit to hand restraints but the orders were ignored. I observed the inmates actively engaged in a fight, both inmates were exchanging closed fist punches to the head and upper torso. Orders to cease their actions were given but both inmates refused all orders. Chemical munitions were introduced into the cell but the inmates continued their disruptive behavior. Staff entered the cell and both inmates were placed in hand and leg restraints. Utilizing the Reeves Litter,[3] the inmates were escorted to Special Housing where they were medically assessed, decontaminated, and subsequently placed into hard ambulatory restraints due to their continued disruptive behavior.[4]

ECF No. 1-7 at 8.

Attached to its dispositive motion, Defendant provided a copy of a February 8, 2019 Memorandum for Operations Lieutenant Cottrell ("Cottrell") from J. Ervin, Case Manager, regarding "L-A Incident," noting that

> On February 8, 2019, at approximately 10:35am, I responded to a radio call in  L-A Unit for two inmates suspected of being under the influence of an unknown substance. When I arrived to cell 232, I witnessed inmate Fisher . . . lying on the bottom bunk shaking, moaning, and mumbling words incoherently. Inmate Kempker . . . was lying on the floor, shaking, flailing his arms erratically, and yelling very loudly.  Once other

---

[3] A Reeves Litter is a flat lightweight stretcher. See Reeves EMS 101 Flexible Stretcher, *available at:* https://www.theemsstore.com/store/product.aspx/productId/48

[4] The reporting employee was C. Rodriguez; the date and time the report was prepared was February 8, 2019 at 2:00 p.m. Id. A copy of the report was delivered to Plaintiff the following day at 8:10 a.m. Id.  Plaintiff's comments regarding the incident were "I got beat up." Id.

staff arrived in the unit I reported to the unit crossover to retrieve the stretchers, and reeve's litter for transport. When I arrived back to cell 232, I went inside the cell and assisted with placing leg restraints on both inmates. Once out of the cell, I assisted in carrying them both downstairs, and placing them both on stretchers for escort to the Health Services department . . .

ECF No. 36-1 at 24. The Defendant also provided a copy of a February 8, 2019 Memorandum for

John Squires, Deputy Captain, from Cottrell, subject: FCI Fight (OC Deployed) . . . stating:

On February 8, 2019, at approximately 10:28 AM, staff announced two inmates were suspected to be under the influence in L-1. Specifically, staff observed inmate Fisher . . . and Kempker . . . rolling around on the floor with slurred speech and throwing their arms around. When staff arrived both inmates were given direct orders to submit to hand restraints. Both inmates began swinging closed fists to the head and upper torso of each other. Staff gave the inmates orders to stop their assaultive behavior and get down on the ground with negative results. Staff could not approach the situation without being placed in serious danger; therefore, staff deployed (2) 5 round volleys from the pepper ball delivery system[5] which proved to be ineffective. Staff entered the cell with a shield. Inmates continued fighting on the ground and continued to resist staff orders and were combative throwing their arms around refusing to allow staff to place restraints on them. Staff placed inmates in hand restraints and leg restraints and placed the inmates in Reeves litter. Inmates were then taken to the Special Housing Unit. Due to their continued disruptive behavior upon entering the Special Housing Unit inmates were immediately placed in ambulatory restraints. Continuation was requested and granted by the Warden until they can establish a pattern of calm and controlled behavior. The inmates were decontaminated, medically assessed, photographed, and placed in alternate clothing. No staff injuries were reported. Minor inmate injuries reported.

ECF No. 36-1 at 19.

Another Memorandum was prepared for Cottrell by A. McCune, Senior Officer Specialist,

regarding "Unit L-1 Immediate Use of Force," noting that:

On February 6, 2019 at approximately [sic] while I was assigned as FCI Compound # 1, I received a call via radio for two inmates under the influence in unit L-l. When I arrived at Unit L-1, I assisted other staff members in securing the Unit L-1 inmates in their cell. I then went to cell 232, where I observed Lt. J. Cottrell giving inmate Fisher . . . and inmate Kempker . . . several direct orders to submit to hand restraints, both inmates refused Lt. Cottrell orders. At this time Lt. Rodriguez responded to Unit L-1 with. additional staff. I observed Lt. Rodriguez give both of the inmates

---

[5] A pepper-ball is a frangible projectile containing a powdered chemical (capsaicin II pepper) that irritates the eyes and nose in a manner similar to pepper spray. These projectiles are fired from specially designed forced compliance weapons or modified paintball guns.

several direct orders to submit to hand restraints, again both inmates refused to submit to hand restraints. At this time a pepper ball launcher was used and the inmates still refused to submit to hand restraints. I along with other staff then entered cell 232 to place inmate Fisher . . . and inmate Kempker . . . in hand restraints. When I entered the cell I assisted with placing both inmates on the floor of the cell, at which point staff was able to apply restraints. During the immediate use of force[,] both inmate Fisher . . . and inmate Kempker . . . were non compliant and resisted staff members attempting to place them in restraints. Once both inmates had been placed in hand . . . and leg restraints, I assisted with escorting both inmates from the cell to the gurney, the inmates were then escorted from the unit.

ECF No. 36-1 at 23.

A Senior Officer Specialist, J. Bolyard, prepared a Memorandum for Cottrell the same day,

regarding "Inmates under the influence" noting that:

On the above date at approximately 10:28 AM, while working as compound 2 officer, I responded to L-A housing unit cell 232 for inmates that were under the influence of some substance. I entered the cell and assisted in applying hand restraints on I/M Kempker . . . who was resisting staff and refusing orders to submit to hand restraints. I then helped place inmate Kempker on the stretcher and escorted him to the Special Housing Unit. While in Special Housing Unit I continued to keep control of inmate Kempker until the SHU crew could place him into ambulatory restraints.

ECF No. 36-1 at 21. Likewise, a BOP staff member M. Simpson, SOS, also prepared a Memorandum

for Cottrell that day, regarding "Immediate Use of Force," noting that:

On the above date at approximately 10:28 AM, while working as the FCI SHU Property Officer, I responded to an immediate use of force in the FCI Hazelton L-A Unit. I entered a cell and placed hand restraints on Inmate Fisher . . . who was resisting staff and refusing orders to submit to hand restraints. I then helped place the inmate on the stretcher and escorted him to the Special Housing Unit. Next, I assisted in placing Fisher in ambulatory restraint and escorted him to a holding cell. I then assisted in escorting Inmate Kempker . . . to cell 102 and helped place him in ambulatory restraints[.] I also assisted in maintaining control of the inmates during the medical assessment. There were no further incidents and I received no injuries.

ECF No. 36-1 at 22. J. Myers, Senior Officer, also prepared a Memorandum for Cottrell that day,

regarding "Immediate Use of Force," stating that:

On February 8, 2019, at approximately 10:28 AM while working as the FCI SHU #4, I . . . responded to an immediate use of force in the FCI Hazelton L-A Housing Unit. I entered a cell and assisted in placing Inmate Fisher . . . in hand restraints who was

resisting staff and refusing orders to submit to hand restraints. I then assisted in placing the inmate on the stretcher and escorted him to the Special Housing Unit. I then assisted in placing Fisher in ambulatory restraint and escorted him to a holding cell #3.  I then assisted in the proper escorting procedures on Inmate Kempker . . . to cell 102 and helped place him in ambulatory restraints. There were no further incidents and I received no injuries.

ECF No. 36-1 at 30.

M. Webster, Senior Officer, also prepared a Memorandum for Cottrell that day regarding "Immediate use of force L-1," stating

At approximately 10:28am on February 8th, 2019 I willingly participated in the immediate use of force in L-1. I used the shield to subdue inmate Kempker . . . I then assisted in application of restraints and removal of inmate Kemper and inmate Fisher . . . from L-1 to Special Housing Unit.

Once in Special Housing Unit, I assisted in maintaining control of the inmates while ambulatory restraints were applied.

ECF No. 36-1 at 29. W. Lewis, Senior Officer Specialist, also prepared a Memorandum for Cottrell, regarding "application of ambulatory restraints" on Kempker:

On February 8, 2019, at approximately 11:10 A.M., I . . . did assist staff in placing inmate Kempker . . . in the Special Housing restraint chair as he was brought to Special  Housing from Health Services and escorted him to cell 102. Once arriving in cell 102 I did assist in placing him in ambulatory restraints, paper clothing and did perform a visual search with [sic]. I then excited [sic] the cell and continued my duties as SHU rec officer.

ECF No. 36-1 at 27.

Another Memorandum was prepared for Cottrell that day by B. Miles, Senior Officer, regarding "Immediate Use of Force," stating that "[o]n February 8, 2019, at approximately 11:00 A.M., I . . . assisted in maintaining control and placing Inmate Fisher . . . in ambulatory restraints. I received no injuries[.]" ECF No. 36-1 at 31. J. Rosier, Senior Officer, also prepared a Memorandum for Cottrell on February 8, 2019, stating that:

On 08 February 2019 at 11:00 P.M. [sic], I . . . was assigned as the SHU #2 Officer. While Inmate Fisher was being placed in ambulatory restraints I secured I/M Fishers

> [sic] legs and applied leg restraints. I then escorted Inmate Kempker to range 1 cell
> 102 and secured I/M Kempkers [sic] right upper arm while ambulatory restraints were
> applied. Once ambulatory restraints were applied I used the handheld metal detector
> on I/M Kempker with negative results.

ECF No. 36-1 at 26. Another February 8, 2019 Memorandum was submitted to Cottrell by C. Wadlow, Senior Officer, regarding "Use of Force debrief," noting that "[o]n February 8, 2019, at approximately 1:32 PM, I . . . was the camera operator for the Use of Force debrief of Inmate Kempker . . . . and Inmate Fisher . . ." ECF No. 36-1 at 25.  Another Senior Officer Specialist, W. Lewis, also prepared a February 8, 2019 Memorandum for Cottrell regarding "Health Services Video," noting that "[o]n February 8, 2019, at approximately 11:35A.M.[,] I . . . did maintain control of inmates Fisher . . . and Kempker . . . during a Health Services debrief video. I did maintain control and escort both inmates without incident." ECF No. 36-1 at 28. Finally, another Memorandum for Cottrell was prepared that day by B. Miles, Senior Officer, regarding "Medical Debrief," stating that "[o]n February 8, 2019, at approximately 11:35 A.M., I . . . was the camera operator for the medical debrief of Inmate Kempker . . . and Inmate Fisher . . . "ECF No. 36-1 at 32.

When Plaintiff was placed in the SHU, BOP staff secured and inventoried his property. See Tort Claim Investigation, TRT-MXR-2019-06646, ECF No. 36-1 at 36.

On March 1, 2019, Plaintiff was released from the SHU. See ECF No. 36-1 at 36. He signed § 10(b) of his Inmate Personal Property Record, acknowledging receipt of his belongings. See ECF No. 36-1 at 37.

On March 17, 2019, Plaintiff filed a BP-A0943 Small Claims for Property Damage or Loss pursuant to 31 U.S.C. § 3723, alleging that certain personal property went missing when he was taken to the SHU, and requesting reimbursement in the amount of $337.10. ECF No. ECF No. 36-1 at 40. On September 11, 2019, BOP Regional Counsel sent the Warden a letter requesting that the Warden investigate the claim and report his findings by October 11, 2019. ECF No. 36-1 at 39.  A Tort Claim

Investigation into Tort Claim No. TRT-MXR-2019-06646 was concluded on October 7, 2019, recommending denial of the claim. ECF No. 36-1 at 36. On November 9, 2019, BOP Regional Counsel sent a claim denial letter to Plaintiff, advising that he could not file suit over the denial, but that he had three months to ask the BOP to reconsider the claim. ECF No. 9-1 at 1.

On May 22, 2019, Plaintiff filed a Standard Form 95 Administrative Tort Claim with the BOP, realleging his property loss claim and raising new claims for excessive force while unconscious/taken to SHU; being kept in restraints for 10 hours in the SHU causing permanent neuropathy/nerve damage to his hands; sexual harassment and sexual assault; a broken rib; chemical burns to his chest and hands from not being permitted to wash off chemical exposure (pepper balls) for 24 hours; failure to use cameras used during extraction; PTSD, mental distress, pain and suffering, and assault. ECF No. 36-1 at 33 - 34. He requested monetary compensation in the amount of $3,000,400.00 ($400 for the property and $3,000,000.00 for the personal injuries). Id. On November 25, 2019, BOP Regional Counsel sent Plaintiff a claim acknowledgment letter for Tort Claim No. TRT-MXR-2020-01397. ECF No. 12-2 at 1. A Tort Claim Investigation was conducted; denial of the claim was recommended on April 28, 2020. ECF No. 36-1 at 10 – 11. The BOP issued its denial letter on May 11, 2020, noting that Plaintiff had suffered no compensable personal injury due to the any BOP employees' negligence. ECF No. 57-1 at 2.

### III. The Pleadings

#### A. The Complaint

Plaintiff's complaint alleges physical assault, excessive force, sexual harassment/sexual assault, torture, false imprisonment, officer misconduct, false statements, failure by administrative officials to properly address or handle his claims for appeal/civil deprivation, BOP failure to adhere

to its own policies and procedures, deliberate indifference to serious medical needs, and lost/broken property. ECF No. 1 at 6 – 7.

More specifically, Plaintiff alleges that on February 8, 2019, he suffered an "accidental overdose" in his cell when he and another inmate, Richard Fisher, smoked a piece of paper with a chemical on it that caused them to lose consciousness and suffer "convulsions." ECF Nos. 1-2 at 1, 1-7 at 15. He avers that while unconscious, correctional officers shot him repeatedly with pepper balls [ECF No. 1-7 at 15]; physically assaulted him; dragged him down range and down steps [ECF No. 1-7 at 15], kicked him in the ribs [ECF No. 1-7 at 16]; and repeatedly dropped him. ECF Nos. 1-2 at 1, 1-7 at 16. He alleges that once in the SHU, he was "tortured" by "Officer Faburey [sic],"[6] placed in full restraints that were too tight for 10 hours, causing him excruciating pain from the handcuffs and belly chain. ECF No. 1-2 at 1 - 2. The officers repeatedly jeered at him, ordered him to do things, and when he complied, told him "that's my girl" to be demeaning. ECF No. 1-2 at 2, 4. He was forced to kneel, even though he had a prior knee replacement surgery that caused kneeling to be excruciating. Id. at 2. His handcuffs were deliberately tightened further when he complained that they were too tight [id. at 3; ECF No. 1-7 at 16]; and he alleges that he was not allowed to shower for 24 hours to get the chemicals off his skin. ECF No. 1-2 at 4. He contends that he and Fisher were charged with fighting and disobeying an order, but he denies fighting [ECF No. 1-7 at 18], and insists that he did not disobey an order because he was unconscious at the time and therefore incapable of responding to one. ECF No. 1-7 at 15. Finally, Plaintiff alleges that "the nurse" was biased against him and did not give him a good exam. ECF Nos. 1-2 at 3, 1-4 at 2, 1-7 at 7, 18.

---

[6] Despite Plaintiff's repeated misspelling of this BOP employee's name in the complaint, it is apparent that the correct spelling of the title/name of this officer is Senior Officer William Fabery [see ECF No. 36-3 at 2], and therefore, the correct spelling of Fabery's surname will be used hereinafter throughout the complaint.

Plaintiff alleges that his property was in the BOP's possession while he was in the SHU, but when he finally got it back, his eyeglasses were broken and other unspecified property was missing, because "D. Yow was working for BOP during time of pack out. And destroyed/threw away my personal property." ECF No. 1 at 7 - 8.

He contends that on the day he was released from the SHU, he filed a PREA[7] report through the Trulinks email system. ECF No. 1-4 at 1. Plaintiff also argues that during a cell extraction, it is BOP policy to have mobile video available to record the entire time, and also  during the times officers do their restraint checks, but that this was not done during the February 8, 2019 incident or in his restraint checks afterward. ECF No. 1-4 at 3.

Plaintiff contends that he filed an Administrative Tort Claim Standard Form 95 on March 25, 2019 and received a written acknowledgment, assigned the Claim Number TRT-MXR-2019-06646 on September 11, 2019. ECF No. 1 at 4.

Attached to his complaint are: a memorandum in support [ECF No. 1-2 – 1-6 at 1 - 2]; a copy of a September 11, 2019 acknowledgement letter for Administrative Tort Claim TRT-MXR-2019-06646 [ECF No. 1-1]; photos [ECF No. 1-6 at 3 – 4]; a sales slip for purchases at the Hazelton commissary [id. at 3]; copies of emails [ECF No. 1-7 at 1 – 7]; a copy of a February 8, 2019 Incident Report [id. at 8 – 9]; a copy of a Release of Information Consent [id. at 10]; an excerpt from the Ledger Sheets to his Inmate Trust Account [id. at 11]; an Inmate Personal Property Record [id. at

---

[7] "PREA" is an acronym for Prison Rape Elimination Act," which was passed by Congress in 2003, to "provide for the analysis of the incidence and effects of prison rape in federal, state, and local institutions and to provide information, resources, recommendations and funding to protect individuals from prison rape." (Prison Rape Elimination Act, 2003.) In addition to creating a mandate for significant research from the Bureau of Justice Statistics and the National Institute of Justice, PREA funding through the Bureau of Justice Assistance and the National Institute of Corrections has supported major efforts in many state correctional, juvenile detention, community corrections, lockups, and jail systems. The act also created the National Prison Rape Elimination Commission and charged it with drafting standards for eliminating prison rape. Those standards were published in June 2009 and turned over to the Department of Justice ("DOJ") for review and passage as a final rule. The DOJ published the final PREA Standards in the Federal Register on June 20, 2012, and they became effective August 20, 2012. See Prison Rape Elimination Act, *available at*: < https://www.prearesourcecenter.org/about/prison-rape-elimination-act >

12]; a copy of a hand-written statement from another inmate who claimed to have witnessed the incident [id. at 13]; a copy of a hand-written note from inmate Fisher, denying having fought with Plaintiff on the date of the incident [id. at 14]; a copy of what appears to be a 3-page letter titled "Criminal Rights Division" [id. at 15 – 18]; a copy of a March 6, 2019 x-ray report of a film of his left wrist, noting an old healed fracture of the fifth metacarpal but no acute injury [ECF No. 1-8 at 1 – 2]; a copy of a March 4, 2019  BOP Health Services Clinical Encounter [id. at 3 – 4]; and a letter addressed to "Your Honor," requesting access to certain evidence and expounding on the allegations in the complaint. ECF No. 1- 2 at 1 – 2.

Plaintiff contends that as a result of the February 8, 2019 incident, he sustained hand numbness, nerve damage to both hands, scars on both wrists, broken left ribs, chemical burns and scarring on the right side of his body; concussion, bruising on face, chest, arms, wrists, belly, and legs, and that he experiences mental anguish, pain, and suffering from "sexual assault and torture." Id. at 9; see also ECF No. 1-6 at 1.

As relief, he requests Three Million Four Hundred Dollars. ECF No. 1 at 4, 9. Further, he seeks injunctive relief in the form of disciplinary action against Lt. Rodriguez, Officer Fabery, Officer Wadlow, Warden Entzell, Nurse Amy Armell [sic],[8] and Matthew Mellady. Id. at 9.

**B. Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment**

Defendant contends that the case should be dismissed or summary judgment granted in its favor because Plaintiff cannot establish that a duty of care owed to him was breached, sufficient to maintain any negligence claims, and a review of the evidence makes it clear that all of Plaintiff's claims lack merit. ECF No. 36 at 6. Further, Plaintiff's claims regarding lost/broken property should be dismissed for lack of subject matter jurisdiction, because any negligent action by BOP officers

---

[8] A review of the record before the undersigned reveals that Amy Armell is a Physician's Assistant, not a nurse.

regarding lost property falls within the 28 U.S.C. § 2680(c) exception to the sovereign immunity waiver provided by the FTCA. Id. at 11. Next, Defendant contends that assuming for the sake of argument that even if there were a "shred of truth" to the allegations, Plaintiff's claims of sexual harassment and sexual assault would have to be dismissed because the FTCA waives its sovereign immunity only when a tortfeasor acts within the scope of his or her government duties, clearly not the case regarding these allegations. Id. at 11 – 12. Finally, Defendant argues that Plaintiff's civil rights claims are not cognizable in a FTCA action. Id. at 12.

Attached to its memorandum in support of its dispositive motion, Defendant provides copies of three sworn affidavits, Tort Claim Investigations, a Two-Hour Restraints Check Form for inmate Fisher,[9] an excerpt from Plaintiff's BOP medical records, multiple memoranda from BOP staff, Administrative Tort Claims with associated letters, and other documents. ECF Nos. 36-1 – 36-3.

## C. Plaintiff's Response in Opposition[10]

Plaintiff contends that because the Defendant violated the Accardi Doctrine[11] by failing to provide a final adjudication his claim within six months, it is in default and has waived its right to make a decision, thus, his claim(s) should be granted. ECF No. 50 at 1. For the first time, he alleges that BOP staff was negligent, and attempts to refute the Defendant's arguments on the same, contending that BOP staff failed to keep him safe from harm because the calls that went out about the incident were for inmates "under the influence," not inmates "fighting." Id. at 2. In support, he cites to numerous memoranda by BOP staff. Id. He also cites to the statements from 2 other inmates

---

[9] On June 30, 2021, Defendant filed a copy of the Two-Hour Lieutenant Restraints Check Form (24-Hours) for the Plaintiff. See ECF No. 64.

[10] There appears to be a page missing from Plaintiff's response; in Plaintiff's own numeration at the bottom, page 7 is missing. See ECF No. 50 at 6 – 7.

[11] The Accardi Doctrine provides that when an agency fails to follow its own procedures or regulations, that agency's actions are generally invalid. United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 268 (1954).

who said they witnessed Plaintiff and inmate Fisher "having convulsions" or a "medical situation," not a fight. Id. at 2 – 3. He insists that it was impossible for him and/or Fisher to understand and follow orders, because they were incoherent and not of sound mind, and thus, use of pepper balls was excessive under the circumstances. Id. at 3 - 4.  He argues that Defendant failed to follow its own policy by not recording the cell extraction, because a video record would have protected both parties, and would have also revealed Officers Fabery and Wadlow, under Rodriguez's supervision, sexually harassing and assaulting him. Id. at 4 – 5. He again insists he was dragged down the range and down the stairs, not placed on a stretcher to be taken to the SHU, as Defendant claims. Id. at 4.

Plaintiff argues that the Two-Hour Restraints Check Forms are irrelevant in this matter and states "[i]n fact, there is no record of a Two-Hour Lieutenant Restraint Check Form for the Plaintiff." Id. at 5. He repeats his allegation that when he complained that the handcuffs were too tight, SHU staff only tightened them further. Id.  He cites to his medical records in support of his claims of nerve injury in his hands from too-tight cuffs. Id. at 5 – 6.  He states that Health Services "was to conduct an EMG to assess for nerve damage, but failed to do so." Id. at 6. He concludes by averring that he has proven the Defendant's negligence and breach of its duties, and "staff misconduct" regarding sexual harassment and "blatant disregard for their own policies[]" and asks the Court to deny Defendant's dispositive motion. Id. at 7 - 8.

Attached to his response, Plaintiff includes hand-written excerpts of BOP Program Statement ("PS") 5566.06 policy on use of force and application of restraints. ECF No. 50-1 at 1 – 3; 2 pages of excerpts from his medical records (duplicates to what has already been provided) [id. at 4 – 5]; a copy of a sales receipt [id. at 6]; and copies of several photos that are so dark their images are not visible. Id. at 6 – 7.

## D. Defendant's Reply

Defendant reiterates its earlier arguments and notes that Plaintiff's continued claim that it was at fault for not making a final disposition of his tort claims within its six-month time limit is "simply incorrect," because the failure of a federal agency to make a final FTCA administrative claim disposition within six months after it is filed creates no cause of action for Plaintiff and does not result in any violation of policy or procedure. ECF No. 55 at 1 – 2.  Further, Defendant reiterates that Plaintiff's negligence claims must be dismissed because Plaintiff cannot show any duty of care was breached; by Plaintiff's own admission, he was so intoxicated after ingesting the drug(s) that he could not follow commands only proves that the BOP's officers had a duty to use ordinary diligence to control the situation to keep him and others safe, because Plaintiff admittedly could not control himself. Id. at 2. Finally, Defendant contends that Plaintiff's remaining claims regarding lost property, sexual assault/harassment, and constitutional claims should be dismissed, given that Plaintiff's response fails to even address them, let alone make any showing in support of his burden of proof as to why they should not be dismissed. Id. at 3.

**E. Plaintiff's Surreply**

Without seeking leave of Court, Plaintiff has filed a 10-page surreply with exhibits.[12] ECF No. 57. Plaintiff is advised that pursuant to Local Rule of Prisoner Litigation Procedure ("LR PL P") 11(d), surreply and surrebuttal memoranda may not be filed, thus, his surreply will not be considered.

**F. Plaintiff's Motion for Summary Judgment in Favor of Himself/**

Plaintiff argues that while Defendant's "Declaration of Michael Moore" claims there was no time for BOP staff to capture video of the immediate use of force, BOP staff certainly had time to grab their weapons, pepper ball gun, pepper spray and shields. ECF No. 53 at 1. He argues that even

---

[12] Attached to a copy of the surreply, in addition to copies of other documents already produced, is a copy of a May 11, 2020 denial letter for Plaintiff's Administrative Claim No. TRT-MXR-2020-01397. See ECF No. 57-1 at 2.

if Defendant has no footage of the incident itself, it has still failed to produce the post-incident debrief video in Health Services or the required video documentation of each and every restraint check in the SHU. Id. He contends that he sent emails to both the warden and unit manager, requesting that the video from that date be saved. Id. He also avers that he wrote to his state Senator Chuck Grassley, asking for help; that there was a "congressional inquiry into the matter" and Grassley sent him a copy of the BOP response, which "clearly states" that the SIS[13] officer reviewed video of the incident and "determined it did not coincide with my allegations." Id. at 1 – 2. Plaintiff concludes that either the Michael Moore Declaration was false if it claims that there was no video saved, or the video was deleted to "cover up" BOP staff misconduct. Id. at 2. Therefore, he argues that summary judgment in his favor is warranted. Id. at 2.

He attaches a copy of the Michael Moore Declaration and a copy of an April 29, 2019 letter from D.J. Harmon, Regional Director of BOP to Senator Chuck Grassley, apparently written in response to an April 12, 2019 letter from Grassley stating in pertinent part

> A review of this matter revealed Mr. Kempker arrived at FCI Hazelton on April 2, 2018, which he resided in the general population. On February 8, 2019, Mr. Kempker was subject to an immediate use of force due to being under the influence of an illicit substance, and engaging in a physical altercation with another inmate. As a result of his disruptive behavior, Mr. Kempker was restrained and transported to the Special Housing Unit for security purposes.  On the same day, the restraints were removed from Mr. Kempker after he had shown a pattern of compliant behavior.  On February 11, 2019, an After Action committee met and determined the actions taken with respect to the use of force and/or applications of restraints on Mr. Kempker were appropriate and in accordance with the Bureau of Prisons' policies. On March 14, 2019, Mr. Kempker reported an allegation he was sexually harassed by staff while he was restrained for he aforementioned incident. The Special Investigative Supervisor (SIS) was notified of the allegation which an investigation was initiated. The SIS Official met with Mr. Kempker and conducted staff interviews which no substantiate [sic] evidence was found to support his claim. In addition, the SIS Official conducted a review of the video from the camera footage and determined it did not coincide with Mr. Kempker's allegations.  Based on this

---

[13] The investigation of crimes, if violent, within a federal prison may be conducted jointly by agents of the Federal Bureau of Investigation (FBI) and the staff of the BOP's own Special Investigative Service ("SIS"). However, in the absence of a violent crime, an SIS investigation focuses primarily on infractions of rules and policy by both inmate and staff.

information, it was determined there is no evidence found which indicates staff acted inappropriately or improperly towards the treatment of Mr. Kempker.

A review of Mr. Kempker mother's request for him to be transferred to another facility was conducted. Prior to Mr. Kempker's incident on February 8, 2019, his Unit Team submitted him for a Low Security Transfer. As a result of the occurrence, Mr. Kempker is no longer eligible for a transfer consideration due to a security level increase. FCI Hazelton maintains a high standard level of safety and security for both staff and inmates and we believe this is an appropriate institution to allow Mr. Kempker to continue with programming opportunities.

ECF No. 53-1 at 2 – 3. Plaintiff also attaches a copy of a March 10, 2019 email from himself to the Warden, stating "I need to get the video survaillance preserved from febuary 8th 2019.. who can I contact? also it has been over 20 days since I received my dho sentence but still havent received my dho report isnt that a violation of bop policy" ECF No. 53-1 at 4 (all spelling and grammatical errors in original).

## G. Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment in Favor of Himself

Defendant first notes that in response to this Court's May 12, 2021 "Order Granting Plaintiff's Motion Directing Defendant to Produce Copy of Any Video of February 8, 2019 Incident," the Declaration of Michael Moore, SIS Lieutenant at FCI Hazelton averred that no video was captured of the cell extraction because "Plaintiff and another inmate [were] . . . observed rolling around on the floor of their [sic] cell, with slurred speech, throwing their arms around each other, and exchanging closed fist punches to the head and upper torso of each other, the need for force was clearly immediate [and not calculated]." Id. at 1 – 2.  Moore noted that while there was no video of the cell extraction incident itself, there was footage of the post-incident debriefing of the officers involved in the use of force and the post-incident medical assessments of Plaintiff and the other inmate. Id. at 2 – 3. Accordingly, Defendant filed those videos under seal and noted it would make arrangements for Plaintiff to view the same. Id. at 3. Defendant further notes that no authority exists for summary

judgment in Plaintiff's favor under the circumstances, nor has Plaintiff cited to any, and reiterates its request that Plaintiff's motion for the same be denied. Id.

### III. Standard of Review

#### A. Motion to Dismiss - Subject Matter Jurisdiction - Fed.R.Civ.P. 12(b)(1)

A party may move to dismiss an action for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The burden of proving subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss is on the party asserting federal jurisdiction. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).  A trial court may consider evidence by affidavit, deposition, or live testimony without converting the proceeding to one for summary judgment. Id.; Mims v. Kemp, 516 F.2d 21 (4th Cir. 1975). "Unlike the procedure in a 12(b)(6) motion where there is a presumption reserving the truth finding role to the ultimate factfinder, the court in a 12(b)(1) hearing weighs the evidence to determine its jurisdiction." Adams, 697 at 1219. Further, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Materson v. Stokes, 166 F.R.D. 368, 371 (E.D. Va. 1996). Whenever it appears, by suggestion of the parties or otherwise, that the court lacks jurisdiction of the subject matter, the court shall dismiss the action. Fed. R. Civ. P. 12(h)(3).

#### B. Motion to Dismiss – Failure to State a Claim - Fed.R.Civ.P. 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir.1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)).  In considering a motion to dismiss for failure to state a  claim, a plaintiff's well-pleaded allegations are taken as true and the

complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); See also Martin at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly at 554-55. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id.

Plaintiff is proceeding pro se and therefore the Court is required to liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520-1 (1972) (per curiam); Erikson v. Pardus, 551 U.S. 89, 94 (2007); Loe v. Armistead, 582 F.2d 1291 (4th Cir.

1978); Gordon v. Leeke, 574 F.2d 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, Haines, 404 U.S. at 520, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Id. at 520-21. The mandated liberal construction means only that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999). However, a court may not construct the plaintiff's legal arguments for her. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985).

"Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." Alternative Energy. Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30, 33 (1st Cir.2001) (*cited with approval* in Witthohn v. Federal Ins. Co., 164 Fed. Appx.  395 (4th Cir. 2006) (unpublished)). There are, however, exceptions to the rule that a court may not consider any documents outside of the complaint. "Courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499, 2509 (2007).

When, as here, a motion to dismiss pursuant to Rule 12(b)(6) is accompanied by affidavits, exhibits and other documents to be considered by the Court, the motion will be construed as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

## C. **Motion for Summary Judgment – Fed.R.Civ.P. 56**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex, 447 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256.

The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248. To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson at 248. Summary judgment is proper only "[w]here the record taken as a whole

could not lead a rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 587

(citation omitted).

## IV. Analysis

### A. Intentional Acts: Physical Assault

As an initial matter, it is apparent from a careful review of the record that Plaintiff's complaint

only alleges intentional acts, and nowhere alleges that any of Defendant's employees were negligent;

Plaintiff's first mention of Defendant's negligence was in response to the Defendant's dispositive

motion. However, when deciding a Rule 12(b)(6) motion to dismiss, the district court is limited to

the allegations set forth in the complaint. See Kennedy v. Chase Manhattan Bank, 369 F.3d 833, 839

(5th Cir. 2004). It is it is axiomatic that the complaint may not be amended by the briefs in opposition

to a motion to dismiss. See Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984);

see also Agnew v. NCAA, 683 F.3d 328, 348 (7th Cir. 2012) (It is improper to amend a complaint

via a response to a motion to dismiss); see also Brown v. United States DOJ, 1:17cv144, 2019 U.S.

Dist. LEXIS 44806, *24 - 25 (N.D. W.Va. Jan. 23, 2019), *adopted by* Brown v. United States DOJ,

2019 U.S. Dist. LEXIS 43936, Keeley, I.M. (N.D. W.Va. Mar. 18, 2019).

Likewise, "[a] plaintiff may not amend her complaint through argument in a brief opposing

summary judgment." Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262 F. App'x 556, 563 (4th

Cir. 2008)(citations and quotations omitted); Gilmour v. Gates, McDonald and Co., 382 F.3d 1312,

1313 (11th Cir. 2004) (*per curiam*) (holding that a non-moving party plaintiff may not raise a new

legal claim for the first time in response to the opposing party's summary judgment motion); see also

Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir. 1996)(A plaintiff may not amend her

complaint through argument in a brief opposing summary judgment); Fisher v. Metro. Life Ins. Co.,

895 F.2d 1073, 1078 (5th Cir. 1990) (allegation of improper benefits calculation not raised in second

amended complaint but only in response to summary judgment motion was not properly before

court); Green Country Food Mkt., Inc. v. Bottling Group, LLC, 371 F.3d 1275, 1279 (10th Cir. 2004)
(failure of plaintiff to cite to statutory provision did not put defendants on notice of need to defend
against that claim).

Because Plaintiff's complaint does not contain allegations that speak to negligence, the Court
will not consider any negligence argument Plaintiff suggests in briefing.

Plaintiff contends that after he and inmate Fisher inmate smoked the chemical-impregnated
piece of paper before becoming "unconscious," he was physically assaulted, shot with pepper balls,
dragged down range and down the stairs, kicked in the ribs, and repeatedly dropped, *en route* to the
SHU. Plaintiff alleges that as a result of these wrongful acts, he sustained nerve damage in his
wrists/hands, broken ribs, scars, chemical burns, concussion, bruising, and mental anguish/PTSD.

Attached to his complaint, Plaintiff provided a hand-written summary titled "Criminal Rights
Division," which states:

On Febuary 8th 2019 at 10:30 AM Richard Fisher . . . and I were in my cell and we
smoked a peice of paper with a chemical on it and both went unconscious. My
cellmate Matthew Bush . . . witnessed us both laying on the floor convulsing . . .
Officer Yow come by our cell and notified security team And medical that he had an
incident and was in need of assistance. For a period of a half hour nurse Amy Armell
and other officers were yelling at us to "get up and cuff up" the door had been secured
and they were yelling from the slot in the door.  We were both unconsious and could
not comply we were in need of medical Assistance. Lt. Rodrigez fired pepper ball
weapon into cell and struck both Fisher and I repeatedly in chest, legs, and arms
Inmate fisher became aware and walked to the door to get cuffed up. At that time the
door was opened and I was drug out of the cell and The dragged down a flight of steps.
This was witnessed by many of the inmates watching from there cell doors They also
told me they heard officers yelling at us for 20 minuts or more to get up. While we
were unconsious.  I was taken by streacher to the S.H.U. and stripped down and placed
in a paper suit. At this time I became conscious and was being kneed in the left ribcage
repeatedly also lifted up by several officers and dropped on my back. I was eventually
wheeled into a suicide cell and told to stay there. I was in a bellychain and Handcuffs
at the time and they were secured extremely and exceedingly tight

Periodically I was checked on and on two occations I pressed the medical emergency
button and told them my hands were numb and that they were swelling up. A nurse
came and checked but didn't really look until the second time she noticed my hand

were swelling and told officers to loosen my right cuff, they pretended to comply and clicked handcuffs down harder and left me in the cell this went on for 7 hours. I was in extreeme pain. On one occasition. Officer Fabury came in and noticed my paper suit had fall around my ankles and told me to back up and get on my knees. Officer Faburey was constantly degrading me and yelling and said I had nothing coming and kept me in cuffs. He pulled my pants back up and warned me not to let them fall agian. I have no control over that because of the restraints. and. the paper pants were ripped down the back when they dressed me in them. Later He came back and noticed they had fallen down again. He told me to Face the wall. He opened the cell door and told me to back that ass up and I complied. He then said that's my girl and forced me on my knees the removed the shackels and told me How stupid I was for smoking chemicals and said they would be back later to remove the handcuffs. My hands had lost all feeling and I felt totally defeated. An hour later they came back and removed my cuffs and bellychain and there was a definatly black and blue Lines where the cuffs had been and a mark around my belly. I was given a paper sheet and stayed there the night the next day officer Fabury escorted me to another cell and told me to face the wall. I complied and He said "that's my girl" again.  I forgot to mention that earlier when I was in the other cell He had me on my kees with his left hand on my bellychain and his right hand on my shoulder He had reach up and was fondling my ear as he was talking shit to me

inmate Fisher also said officer Faburey grabbed his testicals and twisted them hard and asked him how he liked it.

Also that Day an officer Wadlow was walking down the range singing all my Bitches live on range one Now this treatment has been happening to many inmates who come in for smoking chemicals on paper. night after night I hear people screaming about the cuffs being to tight and being beat up.

I was released from the S.H.U. and immediatly file a P.R.E.A. report and so did inmate Fisher. We also went to Health services and showed them our hands and told them we still have no feeling in our hands. Nurse Amy Armell was the nurse and she was upset that we showed up and said she would try to be nonbias but I could tell she didn't examine me very well I'm also filing a complaint with the case manager and a complaint to regional.

We were charged with Fighting and disobeying an order. these never occured Inmate Fisher is my best friend. I think we were charged with that to justify the paintball gun on us and the physical assault on both of us. Please I need your assistance . . .

ECF No. 1-7 at 15 – 18 (all spelling and grammatical errors in original).

Attached to his complaint, Plaintiff provides an unsworn statement from his cell mate,

Matthew Bush; Bush's statement says:

> I . . . witnessed Scott Kempker and Richard Fisher both having convulsions Richard
> Fisher was on the bottom bunk and Scott Kempker was on the floor of the cell # 232
> when I walked in. Officer Yow was also present at the same time both Scott and
> Richard from my point of view seemed to be having a medical situation. At no time
> did I witness Scott or Richard in an physical or verbal altercation. 6/6/19 Matt Bush .
> . .

ECF No. 1-7 at 13 (all spelling and grammatical errors in the original).

Plaintiff also attaches a copy of an unsworn statement from Richard Fisher, the other inmate involved in the February 8, 2019 incident, stating "I . . . did not engage in any type of altercation with Scott Kempker at any time on Feb 8. Their [sic] was never any type of fight or altercation at all. Richard Fisher . . .  6-7-19." ECF No. 1-7 at 14.

Approximately six months before the Defendant was directed to answer the complaint, again without seeking leave of Court, Plaintiff also filed a group of thirteen "Affidavit(s) of Truth" from various inmates, all of which are unsworn, in which each inmate initials a box on a hand-written form created by Plaintiff, claiming that they were 1) victims of falsified government documents that cost them GCT and personal property at FCI Hazelton; 2) it is "common knowledge" that BOP officers are physically and mentally abusive; and 3) they personally were physically and/or mentally abused by a BOP officer. See ECF No. 16-1 at 1 – 13. Because none of them are sworn statements, let alone have any relevance to Plaintiff's particular claims at issue here, they will not be given any consideration.

As noted *supra*, Defendant's version of the event is very different; it indicates that when BOP staff discovered Kempker and Fisher rolling around on the cell floor, shaking, moaning, yelling/screaming and/or mumbling incoherently, they directed the inmates to submit to restraints; the orders were ignored; then the two inmates began exchanging punches to each other's head and upper torso, orders to stop that were likewise ignored. Pepper balls were then used, to no avail. Staff then entered the cell using shields and placed each inmate (both of whom continued to resist) in hand

and leg restraints. They were then placed on stretchers and removed from the cell and taken to the SHU where they were examined by Health Services, decontaminated, and placed in hard ambulatory restraints because of their continued resistance/disruptive behavior. The Defendant has provided copies of numerous contemporaneously-created memoranda from various staff members who were involved in subduing Plaintiff and Fisher, copies of Tort Claim Investigations, and copies of sworn Declarations from two officers (Wadlow and Fabery) attesting to the facts as they occurred. Plaintiff's complaint, admittedly filed under oath, attaches only two unsworn statements by inmates who partially support his version of events.

In his response in opposition, Plaintiff admits that at the time of the incident, he was so intoxicated from voluntarily ingesting whatever chemical/drug was on the paper, he was not in a "conscious, coherent state of mind to clearly understand and follow the direct orders given to us by staff." ECF No. 50 at 3. Further, Plaintiff argues "how can one knowingly and willingly refuse to submit to hand restraints if one is clearly incoherent, not of sound mind or consciousness?" Id. While Plaintiff alludes to the many inmates who supposedly witnessed him being dragged from his cell and manhandled, it is notable that none of those inmates have provided sworn affidavits attesting to this. The numerous contemporaneously-created memoranda from BOP staff about the incident all indicate that Plaintiff and Fisher were taken by stretcher ("Reeves litter") to the SHU, not forcibly dragged, kicked, and dropped on their way there. As noted *supra*, neither of the two statements that Plaintiff did provide (one from inmate Fisher and one from his cellmate Bush) are sworn statements. Moreover, Bush's claim that Kempker and Fisher appeared to be experiencing "convulsions" or a medical situation is irrelevant; presumably Bush is not a medical professional, qualified to offer such an opinion; moreover, it is unlikely that Bush witnessed any more than the

initial onset of the incident, when it first appeared to be only two inmates "under the influence," before it progressed into the two inmates finally starting to punch each other.

Further, Plaintiff's claims of injuries lack support in the record. Plaintiff claims to have sustained hand numbness from nerve damage, scars on both wrists, broken left ribs, chemical burns and scarring on the right side of his body; a concussion, bruising on face, chest, arms, wrists, belly, and legs, and alleges that he experiences mental anguish, pain, and suffering from "sexual assault and torture." ECF No. 1 at 9; see also ECF No. 1-6 at 1. However, Health Services repeatedly checked Plaintiff while he was in restraints, beginning a half hour after the incident, at 11:00 a.m. on February 8, 2019. See Health Services Restraint Review Form (24-Hours),[14] ECF No. 36-1 at 14. At 11:20 a.m., A. Armel PA-C examined Plaintiff, checked all four of his restraints and noted "CMS x 4 intact (circulation, motor, sensory intact to all four restrained extremities)," noted his left eye contusion and his report of right wrist pain, but documented "no abnormality noted." Id. Plaintiff's vital signs were stable, and his current medications were noted to be Lipitor, HCTZ (hydrochlorothiazide, a blood pressure medication), and Lisinopril (blood pressure medication). Id.

The records of a Health Services exam by A. Armel, PA-C, conducted on February 8, 2019 at 11:20 a.m. in Unit Z01 (SHU), a copy of which was produced by both parties,[15] show that Plaintiff was seen less than one hour after the incident; he was pleasant, cooperative, alert and oriented to time, place, and person, and reported unspecified symptoms in his right wrist, but when asked what caused it, he reported "I don't know what happened." See BOP Health Services Clinical Encounter,

---

[14] The form notes that "Health Services staff must check the inmate twice during each eight (8) hour shift. This form is used in addition to regular inmate medical file." See ECF No. 36-1 at 14.

[15] Plaintiff produced, attached to his letter motion to submit medical records, Plaintiff produced medical records for five different dates of service/visits, but mixed up the pages and did not produce a complete copy of any visit except for the day of the incident, February 8, 2019 [ECF No. 27-1 at 1; ECF No. 27-2 at 1 – 2] and March 4, 2019 at 9:25 a.m. [ECF No. 27-3 at 1, ECF No.. 27-1 at 2]; he produced a partial record (page 2 of 2) for a 2:54 p.m. visit on March 4, 2019 [ECF No. 27-3 at 2]; a partial record (only page 1 of 3) for September 24, 2019 [ECF No. 27-4]; and a partial record for a March 30, 2020 visit (only page 6 of 6). ECF No. 27-4 at 1.

ECF No. 27-1 at 1. He was noted to have a left periorbital abrasion/contusion. ECF No. 27-2 at 1. The contusion was noted as "superior left eye without periorbital edema. EOMI (extraocular movements intact). Id. The neurovascular exam of his wrist/hand/fingers showed intact neurovascular function, no joint deformity, trauma, or abrasions, and the range of motion for his wrist(s)/hand(s)/fingers showed a normal radial pulse and capillary refill. Id.  There was no trauma or contusion to his chest wall. Id.

The undersigned has reviewed the video of this examination. Kempker was brought into the room in a SHU restraint chair, accompanied by two guards ("Simpson" and "Lewis"), with his hands cuffed in front of him and his feet shackled, a glimpse of a chain (ambulatory restraint) is visible around his waist. He is restrained in the chair by straps criss-crossed across his chest, with another wide strap around his waist like a seatbelt. The guards are leaning over holding his arms, as if to restrain him during the exam; they and the examining PA partially obscure the camera's view at times. Kempker is wearing orange pullover shirt and pants, appears to be between 50-60 years of age, slightly overweight, with gray hair and a goatee/moustache.  He is barefoot. He has what appears to be a 2" abrasion or contusion above the inside corner of his left eye extending slightly over above the bridge of his nose. Kempker is not resistive; he appears very calm and is cooperative, readily follows directions, but says very little. Armell asks him if he has any injuries and he looks up at her, shakes his head and says "no," but a minute later, he says "my right wrist hurts. Really bad."

Armell checks his vital signs, listens to his lungs in front and back and tells him to take deep breaths; she examines his face/forehead, looks in his eyes, holds up her finger and instructs Plaintiff to "follow my hand" with his eyes; he complies.  She checks the cuffs on his wrists – he winces and says that his fingers are numb. Armell slides her finger under the cuffs as if verifying that there is space between the cuffs and wrists, tells him to straighten his fingers; he straightens the right fingers

28

but states his left fingers are numb and he cannot move them. She straightens them for him. Kempker's hands and fingers are of a normal pink color, not dusky or purple, and do not appear to be swollen. She checks Plaintiff's pulse oximetry and examines his hands. He complains that his handcuffs are "really tight." She examines his feet and ankles, then tells the 2 guards that she needs to look at Plaintiff's chest and she wants them to unbuckle him. The guards proceed to undo the criss-crossed straps over Plaintiff's chest; Plaintiff is instructed "remain in the chair" and nods in understanding; Armell pulls Plaintiff's shirt out at the neckline and looks down inside at his chest; the guards then lift Plaintiff's shirt partway up, to expose his belly for viewing. His exposed belly has no visible marks on it. Plaintiff made an unintelligible noise and winced slightly when the guards moved his hands. At 6 minutes and 35 seconds into the video, the guards reapply the criss-crossed straps across Plaintiff's chest and then wheel him out of the room backwards.[16] See sealed video, ECF No. 60. According to the Incident Report and memorandum for John Squires, Plaintiff was decontaminated after being examined by Health Services, and then placed in paper clothing. See ECF Nos. 1-7 at 8; 36-1 at 19.

While Plaintiff remained in ambulatory restraints in the SHU, he was checked by SHU staff at least every two hours. At the first restraints check at 1:00 p.m. on February 8, 2019, Plaintiff was noted to be complaining about being in restraints and refused to answer staff questions. See Kempker Two-Hour Lieutenant Restraints Check Form, ECF No. 64 at 1. Health Services also checked Plaintiff at this time; A. Armel PA-C examined Plaintiff, checked all four of his restraints and noted "CMS x 4 intact (circulation, motor, sensory intact to all four restrained extremities)," noted his left

---

[16] There is approximately a 4-minute gap in the video after Kempker's exam, in which nothing is visible except a view of a white painted cinder block wall. At 11 minutes and 38 seconds into the video, inmate Richard Fisher is wheeled into the room, also in a SHU restraint chair. He is also calm, cooperative, and says very little. He is restrained in the same way Plaintiff was. He has no visible injuries, but reports that he cannot feel his fingers/hands. A similar exam is conducted on him and then he is wheeled out. See sealed video, ECF No. 60.

eye contusion and his report of right wrist pain but documented "no abnormality noted." See Health Services Restraint Review Form (24-Hours), ECF No. 36-1 at 14.  Plaintiff's vital signs were stable, "CMS x 4 intact" was again noted; there were no changes in his injuries; his use of the toilet and consumption of food and liquid were independent; he was considered stable with no acute changes. Id.

At the 3:00 p.m. check, SHU staff noted that Plaintiff was still continuing to refuse to speak to staff and was described as passively resistant to orders. See Kempker Two-Hour Lieutenant Restraints Check Form, ECF No. 64 at 1.

At the 5:00 p.m. restraints check, Plaintiff was described as "resisting order and kicking on door." Id.

By 7:00 p.m., BOP staff noted that Plaintiff had "cal[m]ed down considerably & has become compliant," thus, the leg restraints were removed. Id. at 2. Health Services also checked Plaintiff at this time; a Health Services personnel member whose name appears to be D. Pough [sic - title illegible] examined Plaintiff, checked all four of his extremities and noted "CMS x 4 intact." See Health Services Restraint Review Form (24-Hours), ECF No. 36-1 at 15.  Plaintiff's vital signs were stable with no labored breathing and his SpO2 was 97%;[17] "CMS x 4 intact" was again noted; he had used the toilet independently; was eating and drinking independently, but refused to report his intake and output; had no new injuries; and his overall assessment was noted to be stable. Id.

---

[17] SpO2, also known as oxygen saturation, is a measure of the amount of oxygen-carrying hemoglobin in the blood relative to the amount of hemoglobin not carrying oxygen.  It is tested by applying a pulse oximeter to the finger, and a percentage will be displayed on the screen. The percentage should be between 94 – 100 %, which indicates a healthy level of hemoglobin carrying oxygen through the blood. See HomeCare - Understanding SpO2 and Normal Oxygen Levels, available at: < https://www.homecaremag.com/understanding-spo2-and-normal-oxygen-levels >

By 9:00 p.m. on February 8, 2019, because Plaintiff remained calm and compliant, SHU staff removed the remaining restraints. See Two-Hour Lieutenant Restraints Check Form, ECF No. 64 at 2.

On March 1, 2019, Plaintiff was released from the SHU. See ECF No. 36-1 at 36.

The next available record of Plaintiff being seen again by Health Services was not until 9:25 a.m. on March 4, 2019, almost a month after the incident, when he was seen in Health Services in sick call; his chief complaint at that time was "pins and needles" type pain on a scale of 4 out of 10 in "multiple" locations, with an onset of 3-4 weeks previously, exacerbated by lying on his side to sleep and relieved by "shaking hands to get feeling back in fingers." ECF No. 27-3 at 1. PA-C Armel reported that he "doesn't have any feeling in left dorsal aspect. Reports that he has feeling on palmar aspect of left hand. Right hand is numb in the same locations. States that he continues to have swelling of left wrist and reports belly chain markings." Id. He was pleasant, cooperative, alert and oriented to time, place, and person and appeared well. Id. A musculo-skeletal exam of his wrist(s)/hand(s)/fingers revealed full range of motion in his right hand, and swelling and tenderness to his left. ECF No. 27-1 at 2. The exam noted that the head contusion had resolved, and Plaintiff had "unspecified disturbances of skin sensation," as well as

> [e]cchymosis (bruising) almost resolved entirely to right side of abdomen, residual belly chain markings. Monofilament[18] intact of bilateral hands. Cap[illary] refill normal. Radial pulse intact bilaterally. Healing abrasions to bilateral wrists with swelling persisting to left wrist. Negative any erythema [redness] or signs of infection.

---

[18] Monofilament testing is an inexpensive, easy-to-use, and portable test for assessing the loss of protective sensation, and it is recommended by several practice guidelines to detect peripheral neuropathy. Monofilaments, often called Semmes-Weinstein mono-filaments, are calibrated, single-fiber nylon threads, identified by values ranging from 1.65 to 6.65, that generate a reproducible buckling stress. The higher the value of the monofilament, the stiffer and more difficult it is to bend. Three monofilaments commonly used to diagnose peripheral neuropathy are the 4.17, 5.07 and 6.10.7–9 Forces required to bend these monofilaments are 1, 10, and 75 g, respectively. The filament is placed on the patient's skin (usually the feet); when there is considerable loss of sensation, the patient will not be able to detect the presence of the filament at buckling. See Accuracy of Monofilament Testing to Diagnose Peripheral Neuropathy: A Systematic Review, *available at*: < https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2775618/ >

Id. An x-ray of his left wrist was ordered for "dorsal aspect of hand numbness with swelling to lateral radial head." Id. The x-ray of his left wrist showed no acute fracture or joint malalignment, but there was an old healed fracture of the fifth metacarpal shaft, which had healed well-aligned, and a "mild cortical irregularity at the dorsal triquetrum[19] which could be sequela of old healed fracture." ECF No. 27-5 at 2. He was instructed to follow up at Sick Call and Chronic Care as needed. Id. Of note, there is no mention of any claim of Plaintiff reporting either "concussion" or broken rib(s) during this visit, but attached to Plaintiff's complaint is a copy of a March 2, 2019 email he sent to FCI Health Services only two days before this visit, stating "need to get my hand and back checked out i have no feeling in the tops of my hands due to handcuffs being placed tight on my hands for seven hours and possiblr a broken rib in my back from being kicked .. ECF No. 1-7 at 4 (all spelling and grammatical errors in original).

Attached to Plaintiff's complaint is a copy of a March 5, 2019 email to "doctor" at FCI Health Services, in which he stated

> i went to health services yesterday and asked for documentation on my hands and ribs due to the incident on February 8th when I was taken to the S.H.U. and was assaulted by some officers there. as well as the excessive force and time frame they kept me in cuffs. nurse armell did not give me a very good exam and i feel she was bias toward me.

ECF No. 1-7 at 7 (all spelling and grammatical errors in original).

Plaintiff was also seen again on March 4, 2019 at 2:54 pm by Jennifer Sommer, an optometrist; page one of that record is missing but Sommer's assessment was essential (primary) hypertension and myopia. ECF No. 27-3 at 2.

---

[19] The triquetrum is a carpal bone (one of the 8 bones of the wrist that connect the distal aspects of the radial and ulnar bones of the forearm to the bases of the five metacarpal bones of the hand). The usual injury mechanism of a triquetrum fracture is falling onto an outstretched hand in ulnar deviation. Less commonly, it may be caused by a direct blow to the dorsum (back) of the hand, a situation where commonly other carpal fractures are seen. See Triquetral Fracture, *available at*: < https://radiopaedia.org/articles/triquetral-fracture?lang=us >

Plaintiff attached a copy of a March 19, 2019 email he sent to FCI Health Services, addressed to "doctor," in which he stated "i think i am still expieriancing neuropathy around my wrists and into my hands from the hancuffs that were on me for 8 hours while in the S.H.U. i am requesting an emg . . . " ECF No. 1-7 at 6 (all spelling and grammatical errors in the original).

Plaintiff provided a partial record for a September 24, 2019 follow up visit performed at his housing unit, where he was seen by J. Resh, CRNP, for a chief complaint of a request for medication renewal; he denied pain and was noted to be "stable on current regimen. Doing well on naproxen.[20]" ECF No. 27-4 at 2. There is no indication in the minimal partial record of this visit what the naproxen was prescribed for.

Plaintiff provided a copy of one page out of six of a March 30, 2020 visit in which he was seen by Emmanuel Adams, MD, who recommended a neurology consult for an electromyelogram ("EMG")/Nerve Conduction Study; the reason for the request was

> 48 yo (year old) male with h/o (history of) HTN (hypertension), prediabetes and HLD (hyperlipidemia). He has a c/o (complaint of) numbness on the dorsal aspect of both hands x1 year after being restrained in handcuffs. Reported his hands became swollen and dusky purple when he was restrained. Requesting EMG of b/l (bilateral) UE (upper extremities) to evaluate for nerve damage.

ECF No. 27-4 at 1. The neurovascular exam to Plaintiff's wrists/hands/fingers was intact, and he had normal radial pulses in his wrists with normal capillary refill. Id.

A careful examination of the record indicates that there is no support for most of Plaintiff's many claims of injuries. When first evaluated by medical staff less than an hour after the incident, Plaintiff at first denied any injuries, then complained of his cuffed wrists hurting. He made no mention of any "broken rib(s)," chest or back pain consistent with such an injury, nor did he exhibit

---

[20] Naproxen is a non-steroidal anti-inflammatory drug ("NSAID"), used to relieve pain from various conditions such as headache, muscle aches, tendonitis, dental pain, and menstrual cramps; it also reduces pain, swelling, and joint stiffness from arthritis, bursitis, and gout attacks. See Naproxen Oral: Uses, Side Effects, Interactions, Pictures, *available at:* < https://www.webmd.com/drugs/2/drug-5173-1289/naproxen-oral/details >

any difficulty during the exam when instructed to take deep breaths; had he actually had a newly-fractured rib, such an examination would have been very painful ; his respirations were 16, a normal rate, and he did exhibited no respiratory distress. Further, his eyes were not watering, his nose was not running, and he had no visible sign of having been exposed to pepper spray/chemical munitions, nor did he report any "chemical burn"[21] anywhere on his body, let alone any other discomfort.

Plaintiff also did not report a headache, appear dazed, or complain of amnesia from being hit in the head, as someone with a concussion would likely do.  Indeed, the undersigned finds that there is no mention in the record *anywhere* but in Plaintiff's complaint regarding his alleged "concussion;" the May 22, 2019 Standard Form 95 Administrative Tort Claim makes no mention of it, although it does allege a "broken rib," despite the fact that there is no evidence in the copies of his medical records produced by either party, of him having ever been diagnosed with either. See ECF No. 36-1 at 33.  Having carefully reviewed the video of the medical exam, it is apparent the only complaint of discomfort that Plaintiff expressed during the February 8, 2019 exam, performed at 11:20 a.m., less than an hour after the incident in the cell, was that his handcuffs were too tight.  He was calm and cooperative, clearly not in the type of distress one would expect from someone who just survived an allegedly violent attack.  The undersigned also notes that it does not appear that Plaintiff made any complaint to SHU staff about pain from his handcuffs or ambulatory restraints between 1:00 p.m.

---

[21] The undersigned notes that a careful review of the record reveals that Plaintiff's complaints of pepper ball-related injuries have varied each time they were referenced: his hand-written summary titled "Criminal Rights Division" states that he was shot repeatedly with pepper balls in the chest, legs, and arms. See ECF No. 1-7 at 15 – 18. His Standard Form 95 Administrative Tort Claim states he sustained "chemical burns" to his chest and hands from not being permitted to wash off chemical exposure (pepper balls) for 24 hours. ECF No. 36-1 at 33 - 34. His claim for relief in the complaint states he sustained "chemical burns and scarring on the right side of his body." ECF No. 1 at 9; see also ECF No. 1-6 at 1.

Further, as for Plaintiff's complaint that he was not permitted to wash the chemicals off for 24 hours, the undersigned notes that Plaintiff was only in handcuffs for 8 or 10 hours.  The restraint and health exam checks during that time indicate that he was able to walk, and had access to food, water, and the toilet throughout that time, and the handcuffs came off at 9:00 p.m.  It begs the question, then, if he had access to water and was in such pain from "chemical burns," why did he not wash?

through 9:00 p.m. that day. <u>See</u> Kempker Two-Hour Restraints Check Form, ECF No. 64 at 1 – 2. Finally, there is nothing in the record to show that Plaintiff ever made any further complaint of his alleged wrist injuries between the March 4, 2019 visit, three days after he was released from the SHU, and March 30, 2020, over a year later, when he falsely reported to the examining physician that "his hands became swollen and dusky purple when he was restrained" and requested that the doctor order an EMG. <u>See</u> ECF No. 27-4. Plaintiff's response in opposition complains that this EMG was never performed; the undersigned posits that a possible reason it was not may have been because the examining physician noted that the neurovascular exam[22] to Plaintiff's wrists, hands, and fingers was "intact," i.e., normal.

Accordingly, at most, it appears that Plaintiff's injuries from February 8, 2019 were minor and transient: the bruise above his eye and some wrist abrasions from the cuffs.  However, the wrist abrasions, and any related "neuropathy" clearly occurred *after* the immediate use of force, when Plaintiff's own continued disruptive and belligerent behavior necessitated his remaining in the restraints. It is unclear, given the exaggerated descriptions Plaintiff has provided for his other "injuries," what the extent, if any, of his injury from wearing the handcuffs was.  Plaintiff's response in opposition states that Health Services "was to conduct an EMG to assess for nerve damage, but failed to do so." ECF No. 50 at 6.  Accordingly, by Plaintiff's own admission, there is no actual proof in the record of wrist "neuropathy" from the handcuffs  beyond his own self-diagnosis, and nothing at all in the record to indicate that Plaintiff ever even complained to any Health Services staff of scars on his wrists or body from chemical burns, concussion, rib fracture, or PTSD.

---

[22]  <u>See</u> Demystifying the Hand Exam, available at: < https://www.nuemblog.com/blog/2018/4/9/hand-exam >

The United States enjoys sovereign immunity except to the extent that Congress has waived it by enacting the Federal Tort Claims Act, 28 U.S.C. §§2671, *et seq.* The FTCA provides at §2674 as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

28 U.S.C. §1346(b)(1) and (2) provide as follows:

> (b)(1) [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
> (2) No person convicted of a felony who is incarcerated while awaiting sentencing or while serving a sentence may bring a civil action against the United States or any agency, officer, or employee of the Government for mental or emotional injury suffered while in custody without a prior showing of a physical injury.

Generally speaking, therefore, the FTCA confers subject matter jurisdiction to the District Courts over negligence actions against the United States. In order to maintain a case against the United States under the FTCA, the plaintiff must demonstrate that his action is permissible under the FTCA and satisfies the necessary elements of a tort claim cognizable under law of the state in which the action accrued. Under West Virginia law, which applies under the FTCA, the plaintiff in a negligence action bears the burden of proof by a preponderance of the evidence to demonstrate the applicable standard of care, deviation from that standard and a causal connection between the deviation and plaintiff's injury. See Judy v. Grant County Health Dep't., 210 W.Va. 286, 291 - 92, 557 S.E.2d 340, 345 - 46 (2001).

The waiver of the federal government's sovereign immunity through the FTCA with respect to negligence claims is not absolute. Congress specified a number of exceptions limiting the waiver

in 28 U.S.C. §2680 including the discretionary function exception and the intentional tort exception,

spelled out at subsections (a) and (h) of that statute as follows:

> The provisions of this chapter and section 1346(b) of this title shall not apply to – (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.
>
> * * *
>
> (h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided*, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For purposes of this subsection, 'investigative or law enforcement officers' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

If an exception set forth in 28 U.S.C. § 2680 applies in an action, the United States has

sovereign immunity, and the District Court has no subject matter jurisdiction. See Cohen v. United

States, 151 F.3d 1338, 1340 (11th Cir. 1998).

A District Court considering whether the discretionary function exception bars an FTCA

claim must determine whether: (1) the action taken involves choice by the acting government

employee or a specific course was mandated by statute, regulation or policy; and (2) the choice is "of

the kind that the discretionary function was designed to shield." Berkowitz v. United States, 486 U.S.

531, 536, 108 S.Ct. 1954, 1959, 100 L.Ed.2d 531 (1988). When established policy allows a

government agent to exercise discretion, "it must be presumed that the agent's acts are grounded in

policy when exercising that discretion." United States v. Gaubert, 499 U.S. 315, 324, 111 S.Ct. 1267,

1274, 113 L.Ed.2d 335 (1991). "'[I]t is the nature of the conduct rather than the status of the actor'

that governs whether the exception applies." Gaubert, 499 U.S. at 323, *quoting* Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 813, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

Under the FTCA's intentional tort exception, the United States is not liable for the intentional torts of its employees unless committed by investigative law enforcement officers of the United States. Correctional officers qualify as "law enforcement officers" as defined in Section 2680(h). See Ortiz v. Pearson, 88 F.Supp.2d 151, 164 (S.D.N.Y. 2000). Accordingly, the FTCA waives sovereign immunity respecting their alleged intentional torts, but "the actions underlying intentional tort allegations described in § 2680(h), if authorized and implemented consistent with federal law and the Constitution of the United States, may be considered discretionary functions under §2680(a), even if they would otherwise constitute actionable torts under state law." Medina v. United States, 259 F.3d 220, 225 (4th Cir. 2001), *citing* Jackson v. United States, 77 F.Supp.2d 709, 714 (D. Md. 1999)("The Court holds that a FTCA plaintiff must first overcome the discretionary function 'hurdle' before the Court will consider intentional tort claims under § 2680(h).")

Eighteen U.S.C. § 4042(a)(3) provides that the BOP has the mandatory duty to "provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States[.]" While this statute creates a mandatory duty, it is well-recognized that it does not set forth the manner in which the duty is to be fulfilled but leaves it to the discretion of the BOP. See Carter v. United States, 2002 WL 32332081, *5 (D.S.C.), 57 Fed. Appx. 208 (4th Cir. Mar. 14, 2003), citing numerous cases. The BOP has specified general principles applying to every disciplinary action taken in its regulations at 28 C.F.R. §541.10(b) as follows:

> (b) The following general principles apply in every disciplinary action taken:
> (1) Only institution staff may take disciplinary action.
> (2) Staff shall take disciplinary action at such times and to the degree necessary to regulate an inmate's behavior within Bureau rules and institution guidelines and to promote a safe and orderly institution environment.

(3) Staff shall control inmate behavior in a completely impartial and consistent manner.
(4) Disciplinary action shall not be capricious or retaliatory.
(5) Staff may not impose or allow imposition of corporal punishment of any kind.

The undersigned finds that this regulation clearly allows considerable discretion to BOP staff in taking disciplinary action.  Moreover, the use of ambulatory restraints on Plaintiff was justified under the circumstances after the immediate use of force, to avoid any further potential for danger/injury to staff or other inmates; thus, the BOP staff's was in compliance with PS P5566.06.

Here, while the Hazelton SHU staff's action in keeping plaintiff in ambulatory restraints for 8 - 10[23] hours might seem excessive, the undersigned finds that the SHU staff had the discretion to enforce institution regulations by addressing Plaintiff's defiance of staff orders as they did, in light of his continued disruptive and aggressive behavior, and the discretionary function exception was designed to protect them against suit under the FTCA for doing so. Because the plaintiff cannot overcome the discretionary function hurdle, it is unnecessary to consider the intentional tort exception. It is further unnecessary to consider Plaintiff's allegation that the Hazelton SHU staff subjected him to purposeful "torture" tactics," or committed assault and battery by dragging him down range, down stairs, kicking him in the ribs, repeatedly dropping him, or by intentionally over-securing his restraints, given that Plaintiff appears to have suffered at most, the  most *de minimis* injury. It is evident that the SHU staff did not abuse plaintiff in any way, despite his perhaps 8-10-hour campaign of resistance. Despite Plaintiff's many allegations to the contrary, there is simply no support in the contemporaneously-created records of the incident to indicate that Plaintiff was ever dragged anywhere, dropped or kicked,  or that he sustained the majority of the injuries he claims to

---

[23] Plaintiff's complaint alleges he was kept in restraints for 10 hours, but attached to his complaint is a copy of March 19, 2019 email he sent to FCI Health Services, addressed to "doctor," in which he stated "i think i am still expieriancing neuropathy around my wrists and into my hands from the *hancuffs that were on me for 8 hours while in the S.H.U.* i am requesting an emg …." ECF No. 1-7 at 6 (all spelling and grammatical errors in the original) (emphasis added).

have sustained. Plaintiff's claims appear to be embellished, manufactured, contradictory and self-serving. It is apparent from the record that the BOP staff did not make contact in any way with Plaintiff other than to subdue an out-of-control, aggressive inmate sufficiently to apply the restraints, and they did so in response to Plaintiff's violation of the unit rules, not with the intention of harming the plaintiff.

Further, Plaintiff has not provided the Court with anything to refute the sworn Declarations of Wadlow and Fabery other than allegations that contradict the record produced by the defendant. Generally unsworn statements without more are not admissible on summary judgment to contradict sworn affidavits. Edens v. Kennedy, 112 Fed. Appx. 870, 877 (4th Cir. 2004) citing Scott v. Edinburg, 346 F.3d 752, 759 (7th Cir. 2003) and Provident Life & Accident Ins. Co. v. Goel, 274 F.3d 984, 1000 (5th Cir. 2001).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." See Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686, 694 (2007). Beyond the unsupported conclusory allegations to the contrary in Plaintiff's admittedly verified complaint, when weighed against the sworn declarations by the Defendant's employees and the facts in each of the contemporaneously-prepared incident reports, Tort Investigations, memoranda to the Operations Lieutenant by numerous BOP staff, long before any of them were aware that litigation would ensue, Kempker has failed to present sufficient evidence to dispute the video evidence and Defendant's assertions that the force applied on February 8, 2019 was applied in a good-faith effort to maintain or restore discipline, and not maliciously and sadistically to cause harm. Kempker's conclusory allegations do not meet the "heightened pleading standard" required in actions against government officials.

See Randall v. United States, 95 F.3d 339 (4th Cir. 1996); see also Dunbar Corp. v. Lindsey, 905 F.2d at 764.

Accordingly, balancing the plaintiff's bald assertions against the Defendant's employees' sworn declarations as well as the entirety of the not-inconsiderable record, the undersigned gives no credible weight to the same and is of the opinion that the plaintiff's claims have no merit.

For all of these reasons, the undersigned finds that summary judgment should be granted to the Defendant and Plaintiff's FTCA claims for physical assault should be dismissed.

**B. BOP's Failure to Adhere to its Own Policy**

Plaintiff contends that the BOP violated its own policy by not creating a video record of his cell extraction, or preserving such video for his use in this case.

As noted *supra*, the Moore Declaration averred that because the use of force was immediate and not calculated, no video of the cell extraction itself existed; but Defendant did produce the post-incident video footage of the use of force debriefing of involved staff, and the post-incident medical exam of the two involved inmates.

A review of BOP P.S. 5566.01 states that

[PURPOSE AND SCOPE § 552.20. The Bureau of Prisons authorizes staff to use force only as a last alternative after all other reasonable efforts to resolve a situation have failed.   When authorized, staff must use only that amount of force necessary to gain control of the inmate, to protect and ensure the safety of inmates, staff and others, to prevent serious property damage, and to ensure institution security and good order. Staff are authorized to apply physical restraints necessary to gain control of an inmate who appears to be dangerous because the inmate:

Assaults another individual; . . . or [b]ecomes violent or displays signs of imminent violence.

This rule on application of restraints does not restrict the use of restraints in situations requiring precautionary restraints, particularly in the movement or transfer of inmates (e.g., the use of handcuffs in moving inmates to and from a cell in detention, escorting an inmate to a Special Housing Unit pending investigation, etc.).]

Under this rule precautionary restraints may also be used as prescribed by medical staff for medical purposes in accordance with procedures set forth in the Health Services Manual.

BOP P.S. 5566.06. Further, § 5 of P.S. 5566.06, "Types of Force" notes that:

5. [**TYPES OF FORCE** §552.21.] Since inmates occasionally become violent or display signs of imminent violence, it is sometimes necessary for staff to use force and restraints to prevent them from hurting themselves, staff, or others, and/or from destroying property.

[a. **Immediate Use of Force**. Staff may immediately use force and/or apply restraints when the behavior described in §552.20 constitutes an immediate, serious threat to the inmate, staff, others, property, or to institution security and good order.]

Section 552.20 refers to Section 1 of this Program Statement.

BOP P.S. 5566.06.  Section 5(b)(1) of the P.S. 5566.06 states in pertinent part that:

(1) **Circumstances**.   Calculated rather than immediate use of force is desirable in all instances corrections workers encounter. Although this is not always possible, staff must use common sense and good correctional judgment in each incident to determine whether the situation allows for the implementation of calculated or immediate use of force procedures.

The safety of all persons is a major concern and Bureau of Prisons staff are required by laws, rules, and regulations, related to the Bureau of Prisons, to protect others from the hostile actions of inmates.   Immediate or unplanned use of force by staff is required when an inmate is trying to self-inflict injuries which may be life-threatening or is assaulting any other person to include other inmates.  The destruction of government property may require the immediate use of force by staff in some circumstances.   If the above circumstances are not present, staff should, if possible, employ the principles of calculated use of force.

Calculated use of force is appropriate, for example, if the inmate is in a secure area or in an area where doors/grills may be secured, including cases when the inmate is making verbal threats or brandishing a weapon, provided staff believe there is no immediate danger of the inmate inflicting injury or harm to himself or herself or others.   Calculated use of force permits the use of other staff (e.g., psychologists, counselors, etc.) to attempt to resolve the situation non-confrontationally . . .

The entire process must be videotaped, including the introduction of all staff participating in the confrontation avoidance process.   The tape and documentation will be part of the investigation package for the After Action Review (see Sections 14 and 15).   Additionally, the Warden must forward a copy of each video tape to the Regional Director within four working days of the incident.

BOP P.S. 5566.06. Section 6 of P.S. 5566.06, "Principles Governing the Use of Force and Application of Restraints" notes in pertinent part that:

**a.   Staff ordinarily shall first attempt to gain the inmate's voluntary cooperation before using force.] . . .**

**[b.   Force may not be used to punish an inmate.**

**1.   Staff shall use only that amount of force necessary to gain control of the inmate.   Situations when an appropriate amount of force may be warranted include, but are not limited to:**

**(1) Defense or protection of self or others;**

**(2) Enforcement of institutional regulations; and**

**(3) The prevention of a crime or apprehension of one who has committed a crime.**

**2.   When immediate use of restraints is indicated, staff may temporarily apply such restraints to an inmate to prevent that inmate from hurting self, staff, or others, and/or to prevent serious property damage.   When the temporary application of restraints is determined necessary, and after staff have gained control of the inmate, the Warden or designee is to be notified immediately for a decision on whether the use of restraints should continue.]**

Restraints should be used only when other effective means of control have failed or are impractical. . .

**[e.   Staff may apply restraints (for example, handcuffs) to the inmate who continues to resist after staff achieve physical control of that inmate, and may apply restraints to any inmate who is placed under control by the Use of Force Team Technique.**
**If an inmate in a forcible restraint situation refuses to move to another area on his own, staff may physically move that inmate by lifting and carrying the inmate to the appropriate destination.] . . .**

**[f.   Restraints should remain on the inmate until self-control is regained.**

If the inmate was placed in restraints because of an assault on staff, the assaulted employee must not be involved in deciding whether the inmate has regained self-control.

**g. Except when the immediate use of restraints is required for control of the inmate, staff may apply restraints to, or continue the use of progressive restraints**

43

**on, an inmate while in a cell in administrative detention or disciplinary segregation only with approval of the Warden or designee . . . ]**

BOP P.S. 5566.06 (emphasis in original).  And finally, § 14(c) of P.S. 5566.06, "Videotape of Use of Force Incidents" states in pertinent part that:

**(c) Videotape of Use of Force Incidents**.   Staff must obtain a video camera immediately and record any use of force incident, unless it is determined that a delay in resolving the situation would endanger the inmate, staff, or others, or would result in a major disturbance or serious property damage.

The video recording will also include any medical examination conducted after:

- the application of restraints,
- use of chemical agents,
- use of pepper mace, and/or
- use of non-lethal weapons.

Calculated use of force shall be videotaped following the sequential guidelines presented in the Correctional Services Manual.   The original videotape must be maintained and secured as evidence in the SIS Office.   A copy of every videotape, after review by the Warden (within four work days of the incident), unless requested sooner by the Regional Director, will be provided immediately to the Regional Director for review.

The Regional Director shall forward videotapes of questionable or inappropriate cases immediately to the Assistant Director, Correctional Programs Division, Central Office, for review.

When a threat to the safety of the inmate, staff or others, or property, requires an immediate response, staff are obligated to obtain a camera and begin recording the event as soon as feasible.   As soon as control of the situation has been obtained staff must record information on:

- injuries;
- circumstances that required the need for immediate use of force; and
- identifications of the inmates, staff, and others involved.

d.  **Documentation Maintenance**.  The Captain must maintain all documentation, including the videotape and the original BP-E583, for a minimum of 2½ years.   A separate file must be established on each use of force incident.

BOP P.S. 5566.06.

Here, it is apparent from a review of P.S. 5566.06 that the BOP staff complied completely with its own policy in determining to use immediate use of force because of the imminent danger of harm to both inmates after non-physical means of control failed, and only progressed to chemical munitions and restraints when nothing else was effective to control the two inmates' unruly and aggressive behavior. Further, they began documenting via video as soon as was practically possible, and then preserved the video as they were required to do. Moreover, Plaintiff asserts that all of the acts of BOP staff were willful and knowing violations of his constitutional rights. The plaintiff states no cause of action with respect to any negligent acts on the part of the defendants. Plaintiff's claim that Defendant did not comply with its own policy has no merit and summary judgment should be granted to Defendant on this claim.

The undersigned further notes that Plaintiff's Motion for Defendant to Produce a Copy of Policy and Procedure for Video Retainment will be recommended for denial as moot, given that the Defendant did preserve the video that existed, and moreover, Plaintiff attached hand-written excerpts of the BOP's Program Statement regarding documentation  via video of use of force and application of restraints to his response in opposition to Defendant's dispositive motion [ECF No. 50-1 at 1 – 2], indicating that he already had access to the same.

## C. Lost Property Claim

Plaintiff's complaint contends that his property sheet supports his claim that his eyeglasses were broken and that unspecified commissary items and clothing went missing when he was taken to the SHU, and that the "pack out officer" was D. Yow. ECF No. 1 at 7.  He alleges, without including any explanation or detail, that Yow "destroyed/threw away my personal property." Id. at 8. Again, it appears that Plaintiff is implying intentional acts on the behalf of one of Defendant's employees, not negligence.

On March 17, 2019, Plaintiff filed a BP-A0943 Small Claims for Property Damage or Loss (31 U.S.C. § 3723) over his lost property. ECF No. 36-1 at 40. In it, Plaintiff alleged that when he was taken to the SHU for "an allegid [sic] fight," Officer Yow secured his property and inventory, and he was now "missing glasses, sweatpants, sweatshirt, bag of coffee, 20 soups, 2 bottles of sweet chili sauce, 2 bottles of squeeze cheese, 10 boxes of Kool-Aid, 10 creamers, 2 bottles of VO-5 shampoo, 2 bottles hot sauce, 10 hot cocoa, 10 French vanilla creamer, 2 bags Dorritos, 2 bags BBQ corn chips. Id. Plaintiff stated that the amount of the claim was $337.10 ($200 for the glasses, and $137.10 for the commissary items). Id. The claim was stamped as received on March 25, 2019. Id. It was assigned Claim No. TRT-MXR-2019-06646. See September 11, 2019 acknowledgement letter, ECF No. 36-1 at 39. The Tort Claim Investigation into TRT-MXR-2019-06646 reports that Kempker alleged that between L-1 Housing Unit and the SHU, these items came up missing: glasses, sweatpants, sweatshirt, 1 bag of coffee, 20 soups, 2 bottles of sweet chili sauce, 2 bottles of VO-5 shampoo, 2 bottles of hot sauce, 10 hot cocoa, 10 French vanilla creamer, 2 bags of Doritos, and 2 bags OG BBQ corn chips, and that Kempker was requesting $337.10 for his missing property. See Tort Claim No. TRT-MXR-2019-06646 Investigation, ECF No. 36-1 at 36. Attached to Plaintiff's complaint is an Inmate Personal Property Record, noting 1 hardcover book; 2 caps/hats; 2 eyeglass cases, 2 pairs of eyeglasses (1 broken); 4 laundry bags; a soap dish; a toothbrush; 1 baby powder; 5 towels; 4 washcloths; 2 instant coffee/instant chocolate; 1 pickle; 2 squeeze cheese; 1 hot sauce; 1" of miscellaneous paperwork; 3 beans; and 1 banana chips. See ECF No. 1-7 at 12. Under "Description of Property," the Officer noted "property found unsecured" and "no individual item over $100." Id.

The property record is signed by Plaintiff in his handwriting[24] on February 19, 2019, acknowledging "I have today reviewed the property returned to me." Id.

In the Standard Form 95 Administrative Tort Claim, filed on May 22, 2019, stamped received June 5, 2019, in which Plaintiff realleged his property claim in addition to raising the other new claims, he alleged that "prescription eyeglasses missing from property. Commissary not in property, food/hygiene products," and asked for $400 in property damage (and $3,000,000.00 in personal injury damages for his other claims), for a total of $3,000,400.00.

Plaintiff is seeking reimbursement in the amount of $400.00 for his damaged/lost property. See Standard Form 95 Administrative Tort Claim. ECF No. 36-1 at 33.

Defendant argues that Plaintiff's claim that a BOP official was responsible for his lost property because the official failed to secure the same while Plaintiff was in the SHU lacks merit, given that Plaintiff's property was found already unsecured when the officer went to secure it; the responsibility for keeping property secure is the Plaintiff's. See Tort Claim Investigation, ECF No. 36-1 at 10.

As previously noted, the FTCA) is a comprehensive legislative scheme through which the United States has waived its sovereign immunity to allow civil suits for actions arising out of negligent acts of agents of the United States. The United States cannot be sued in a tort action unless it is clear that Congress has waived the government's sovereign immunity and authorized suit under the FTCA. Dalehite v. United States, 346 U.S. 15, 30-31 (1953). The provisions of the FTCA are found in Title 28 of the United States Code. 28 U.S.C. § 1346(b), § 1402(b), § 2401(b), and §§ 2671- 2680.

---

[24] In the cover letter to Plaintiff's February 28, 2020 filing of the "Affidavits of Truth" from other inmates, he claims "I sent a copy of my Property Sheet where an officer forged my name and I refused to sign because all my property was missing." ECF No. 16 at 1. The record before the undersigned does not support this.

Despite this limited waiver, FTCA § 2680(c) expressly preserves sovereign immunity for "[a]ny claim arising in respect of ... the detention of any goods, merchandise, or other property by any officer of customs or excise **or any other law enforcement officer."** 28 U.S.C. § 2680(c)(2006)(emphasis added). In 2008, the United States Supreme Court determined that this exception preserves sovereign immunity for torts committed by all federal law enforcement officers specifically including officers employed by the Federal Bureau of Prisons. <u>Ali v. Fed. Bureau of Prisons</u>, 552 U.S. 214 (2008).[25] Thus, FTCA actions involving the detention or mishandling of personal property by prison officials are subject to dismissal. *See* <u>Perkins v. Deboo</u>, 2009 WL 1650443 (N.D. W.Va. June 11, 2009)(plaintiff's FTCA claim seeking reimbursement for loss of personal property dismissed based upon Section 2680(c)); <u>Mathis v. U.S.</u>, 2008 WL 2922798 (D.S.C. July 24, 2008)(plaintiff's FTCA claim that prison officials were negligent in transferring his personal property was dismissed upon Section 2680(c)); <u>Wadley v. Warden</u>, 2008 WL 2455455 (W.D. Va. June 16, 2008)(FTCA claim that prison officials were negligent in seizing and destroying his tennis shoes was dismissed based upon Section 2680(c)).

Accordingly, this Court does not have jurisdiction to entertain the plaintiff's lost property tort claim and that claim should be dismissed with prejudice.

**D. <u>Sexual Harassment/Assault</u>**

Plaintiff contends that while he was in the SHU, an officer, William Fabery sexually harassed and sexually assaulted him by fondling his ear and talking "crazy" to him, and subjected him to 10 hours of unspecified "torture," trying to get him to confess to using drugs. ECF No. 1-6 at 1. He

---

[25] In <u>Ali,</u> the petitioner, a federal prisoner, was transferred from the USP in Atlanta, Georgia, to USP Big Sandy in Inez, Kentucky. Before being transferred, he left two duffel bags containing his personal property in the Atlanta prison's Receiving and Discharging Unit to be inventoried, packaged, and shipped to USP Big Sandy. When his bags arrived, several items were missing, and he pursued a claim under the FTCA.

contends that when he was released from the SHU, he filed a PREA report over the incident. ECF

No. 1-4 at 1. He also alleges that officer Wadlow walked down the range one day, "singing all my

Bitches live on range one." See ECF No. 1-7 at 17.

Attached to Plaintiff's complaint is a copy of a March 5, 2019 Inmate to Staff Message to

FCI Unit L, directed to his counselor, in which Plaintiff states

> I need to get a bp8 from you as well as a possible sensitive 10 I'm not sure how to go
> about filing a complaint with region for the assault that happened to me by the officers
> while I was in the S.H.U. . i went to health services and tried to get this assault
> documented and nurse was not very cooperative with me and i feel was bias toward
> me.

ECF No. 1-7 at 5 (all spelling and/or grammatical errors in original).

Plaintiff also attached to his complaint a copy of a March 12, 2019 Inmate to Staff Message

to Psychology Services, in which Plaintiff states

> i sent a letter as well as email to the doj/prea. last week about an assault that occurred
> while in the shu and or while being transported to the shu. how long does it take to
> receive a response.. i don't know if talking to you will help but i have been super
> anxious about this whole situation.

ECF No. 1-7 at 3 (all spelling and/or grammatical errors in original). FCI Psychology Services

responded "Psychology has no way of checking on the status of any PREA investigation." Id.

Plaintiff contends that since this "sexual assault" he now has "serious anxiety" when

confronted by officers, wakes up at night from the stress, and has daily flashbacks of the incident.

ECF No. 1-6 at 1. He avers that his requests for copies of video and witness statements have been

denied or ignored. Id. at 1 – 2. He contends that he wrote to his Iowa Senator, Charles Grassley,

Senator Ron Johnson, and the FBI, asking to file a criminal complaint and was ignored. Id. at 2. He

also wrote to "civil rights attorneys and USA Today," attempting to get a response. Id.

Setting aside for the moment that the two officers that Plaintiff has accused of sexual assault

and/or harassment have both filed sworn declarations denying the same [see Declaration of Cody

Wadlow, ECF No. 36-2 and Declaration of William Fabery, id. at 2] Plaintiff's allegations that his

ear was "fondled" or that an officer sang an insulting song as he walked through the cell block, even

if true, still would not constitute sexual abuse or harassment.  BOP P.S. 5324.11, Sexually Abusive

Behavior Prevention and Intervention Program, provides in pertinent part:

**§ 115.6 Definitions related to sexual abuse.**

**For purposes of this part, the term—** *Sexual abuse* **includes—**

(1) Sexual abuse of an inmate, detainee, or resident by another inmate, detainee, or resident; and

(2) Sexual abuse of an inmate, detainee, or resident by a staff member, contractor, or volunteer.

***Sexual abuse of an inmate, detainee, or resident by another inmate, detainee, or resident* includes any of the following acts, if the victim does not consent, is coerced into such act by overt or implied threats of violence, or is unable to consent or refuse:**

(1) Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;

(2) Contact between the mouth and the penis, vulva, or anus;

(3) Penetration of the anal or genital opening of another person, however slight, by a hand, finger, object, or other instrument; and

(4) Any other intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or the buttocks of another person, excluding contact incidental to a physical altercation.

***Sexual abuse of an inmate, detainee, or resident by a staff member, contractor, or volunteer* includes any of the following acts, with or without consent of the inmate, detainee, or resident:**

(1) Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;

(2) Contact between the mouth and the penis, vulva, or anus;

(3) Contact between the mouth and any body part where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

(4) Penetration of the anal or genital opening, however slight, by a hand, finger, object, or other instrument, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

(5) Any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

(6) Any attempt, threat, or request by a staff member, contractor, or volunteer to engage in the activities described in paragraphs (1) through (5) of this definition;

(7) Any display by a staff member, contractor, or volunteer of his or her uncovered genitalia, buttocks, or breast in the presence of an inmate, detainee, or resident, and

(8) Voyeurism by a staff member, contractor, or volunteer.

***Sexual harassment* includes—**

. . . (2) Repeated verbal comments or gestures of a sexual nature to an inmate, detainee, or resident by a staff member, contractor, or volunteer, including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures . . .

BOP P.S. 5324.11.

Clearly, the behavior that Plaintiff alleges Fabery and Wadlow committed constitutes neither sexual harassment nor sexual assault. Moreover, even if it did, the FTCA *only* waives sovereign immunity when an employee tortfeasor acts within the scope of his or her government duties. FDIC v. Meyer, 510 U.S. 471, 477 (1994). In Shirley v. United States, 232 Fed. Appx. 419, 420-21 (5th Cir. 2007), *cert. denied*, 552 U.S. 1180 (2008), the Fifth Circuit affirmed the dismissal of an inmate's claim that she was sexually assaulted by a corrections officer. Accordingly, even assuming *arguendo* that the same did occur, these actions would not fall within the scope of Fabery's and Wadlow's government duties, and the claims would still have to be dismissed.

Finally, as for Plaintiff's allegation that inmate Fisher told him that Fabery "grabbed his testicals and twisted them hard and asked him how he liked it," even assuming that the same occurred, this is not a claim that Plaintiff can raise on behalf of Fisher.

### E. **Failure by Administrative Officials to Properly Address or Handle Plaintiff's Claims/Civil Deprivation**

This claim appears to be a <u>Bivens</u> civil rights claim alleging that BOP officials did not properly handle Plaintiff's administrative grievances, thus, it will not be given analysis here.

### F. **False Imprisonment**

Plaintiff's complaint raises a claim of false imprisonment, but does not elaborate on the claim, beyond merely alleging the words "false imprisonment" along with a laundry list of other claims. ECF No. 1 at 6. The undersigned is left to presume that Plaintiff is impliedly alleging that his confinement in the SHU from February 8, 2019 – March 1, 2019 constituted false imprisonment.

As previously noted, in an FTCA action, liability stems from the substantive law of the state in which the alleged misconduct occurred. <u>Medina v. United States</u>, 259 F.3d 220, 223 (4th Cir. 2001). Here, the substantive law of West Virginia applies because Plaintiff asserts that the alleged misconduct occurred as a result of the Incident Report issued at FCI Hazelton for his involvement in the February 8, 2019 altercation.

The elements of false imprisonment are (1) the detention of the person, and (2) the unlawfulness of the detention and restraint. <u>Riffe v. Armstrong</u>, 197 W. Va. 626, 643, 477 S.E.2d 535, 552, (W.Va. 1996) citing <u>Williamson v. Glen Alum Coal Co.</u>, 72 W. Va. 288, 290, 78 S.E. 94, 95 (W.Va. 1913).

Here, however, the undersigned finds that not only is Plaintiff's claim of false imprisonment so inadequately pled[26] it is nothing more than a label, it is apparent from even a cursory review of Plaintiff's May 22, 2019 Standard Form 95 for tort claim TRT-MXR-2020-01397, that nowhere did Plaintiff ever make any claim that even liberally construed could be deemed a claim for false imprisonment.

A plaintiff must file an FTCA lawsuit in "careful compliance" with certain jurisdictional prerequisites. Kokotis v. U.S. Postal Serv., 223 F.3d 275, 278 (4th Cir. 2000) (citations omitted). A prospective plaintiff cannot file a tort lawsuit against the United States without first timely and properly presenting his claim to the appropriate federal agency. 28 U.S.C. § 2401(b); 28 U.S.C. § 2675(a). See also Henderson v. United States, 785 F.2d 121, 123 (4th Cir. 1986) (citing Kielwien v. United States, 540 F.2d 676, 679 (4th Cir. 1976), cert. denied, 429 U.S. 979 (1976)). Indeed, a plaintiff's failure to do so deprives Federal courts of subject matter jurisdiction to address an FTCA lawsuit. Id.

Here, Plaintiff's failure to first raise his false imprisonment claim as an administrative claim deprives the United States adequate notice to properly investigate the underlying incident. Ahmed v. United States, 30 F.3d 514, 516–17 (4th Cir.1994) (citations omitted). Such notice must be sufficiently detailed, to permit the United States to accurately evaluate its exposure to legal liability. Keene Corp. v. United States, 700 F.2d 836, 842 (2nd Cir. 1983). An FTCA lawsuit can generally only address the facts and legal theories presented in the underlying administrative claim. See Williams v. United States, 932 F.Supp. 357 (D.D.C. 1996) (claimant cannot "present one claim to

---

[26] Although Fed. R. Civ. P. 8(c) provides that "all pleadings shall be so construed as to do substantial justice," the Fourth Circuit further holds that a "heightened pleading standard" is highly appropriate in actions against government officials. Randall v. United States, 95 F.3d 339 (4th Cir. 1996). See also Dunbar Corp. v. Lindsey, 905 F.2d 754, 764 (4th Cir. 1990).

the agency and then maintain suit on the basis of a different set of facts"); <u>Bembenista v. United States</u>, 866 F.2d 493 (D.C. Cir. 1989) (where only a sexual assault claim alleged in the SF-95s, failure to include allegations of medical malpractice therein bars an FTCA claim of medical malpractice).

Accordingly, the undersigned recommends that this claim be dismissed for lack of jurisdiction.

**G. <u>Civil Rights Claims of Excessive Force, Deliberate Indifference to Serious Medical Needs</u>**

Plaintiff alleges that he was subjected to excessive force by officers while he was unconscious and taken to the SHU. He also impliedly alleges that "nurse Armell" was deliberately indifferent to his serious medical needs because she was "disrespectful and . . . very bias [sic]" toward him, because she did not give him a "proper exam" or treatment, because she only ordered an x-ray for one wrist and not both. ECF No. 1-4 at 2.

A constitutional civil rights claim is not cognizable in an FTCA lawsuit. <u>FDIC v. Myer</u>, 510 U.S. 471, 477-79 (noting that a constitutional tort claim is not cognizable in an FTCA lawsuit because the United States has not waived its sovereign immunity with respect to constitutional tort allegations); <u>Blanchard v. United States</u>, No. 2:14cv58, 2015 WL 4107311, at 13 (N.D. W.Va. July 7, 2015), <u>aff'd</u> 622 F. App'x 287 (4th Cir. 2015) (*per curiam*) (unpublished) (finding that a civil rights claim alleging a violation of the Eighth Amendment prohibition against cruel and unusual punishment is not actionable against the United States in an FTCA lawsuit because a constitutional tort claim is not cognizable under the FTCA.

As an initial note, while Plaintiff's complaint and his Standard Form 95 Administrative Tort Claim No. TRT-MXR-2020-01397 does allege that the BOP staff subjected him to excessive use of force during the incident at issue, he makes no allegation of any denial of medical care after the incident in his Standard Form 95 Administrative Tort Claim No. TRT-MXR-2020-01397.

While Plaintiff did not specifically assert an actual Eighth Amendment violation in connection with either of these claims, liberally construed, Plaintiff's claims do allege "excessive force" was used, and that he was denied proper medical care afterwards, implicitly alleging that he suffered cruel and unusual punishment, i.e., a violation of the Eighth Amendment.

Nonetheless, because Plaintiff elected to file an FTCA against the United States, not a civil rights constitutional lawsuit against individual BOP employees, even if he had included the deliberate indifference claim in his Standard Form 95 Administrative Tort Claim TRT-MXR-2020-01397, because the Plaintiff alleges that BOP staff violated his constitutional right to be free from cruel and unusual punishment, he fails to state a valid claim for relief under the FTCA.

Claims regarding conditions of confinement, excessive force, and deliberate indifference to medical needs, in violation of Eighth Amendment rights to be free of cruel and unusual punishment are not actionable against the United States in a Federal Tort Claims Act (FTCA), 28 USC §2671 *et seq.* action. A constitutional tort is not cognizable under the FTCA. Royster v. United States, 2008 U.S. Dist. LEXIS 106634 *13 (W.D. Pa. December 1, 2008).

Accordingly, these constitutional claims must be dismissed for failure to state a claim upon which relief can be granted.

## H. Implied Medical Negligence Claim

To the extent that Plaintiff's complaint impliedly alleges that "Nurse Armell [sic]" was negligent in not providing more thorough medical exams and failing to order x-rays on both wrists instead of only Plaintiff's left wrist, despite the fact that neither party has raised the issue, an analysis of a medical negligence claim will be provided.

To establish a medical negligence claim in West Virginia, the plaintiff must prove:

(a) the health care provider failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent health care provider in the profession or

class to which the health care provider belongs acting in the same or similar circumstances; and (b) such failure was a proximate cause of the injury or death.

W.Va. Code § 55-7B-3.

When a medical negligence claim involves an assessment of whether or not the plaintiff was properly diagnosed and treated and/or whether the health care provider was the proximate cause of the plaintiff's injuries, expert testimony is required.  Banfi v. American Hospital for Rehabilitation, 529 S.E.2d 600, 605-606 (W.Va. 2000).

Additionally, under West Virginia law, certain requirements generally must be met before a health care provider may be sued. W.Va. Code §55-7B-6.  This  section provides in pertinent part:

### § 55-7B-6. Prerequisites for filing an action against a health care provider; procedures; sanctions

(a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without     complying with   the   provisions   of   this   section.

At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: The expert's familiarity with the applicable standard of care at issue; the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of rule 15 of the rules of civil procedure.

This Court previously held that compliance with W.Va. Code § 55-7B-6 is mandatory prior to filing suit in federal court. See Stanley v. United States, 321 F.Supp.2d 805, 806-807 (N.D. W.Va. 2004).

Plaintiff's complaint impliedly alleges that "nurse Armell" acted with medical negligence because she provided inadequate exams and appeared to be "biased" against him, because she only ordered an x-ray of his left wrist and not his right. ECF Nos. 1-2 at 3, 1-4 at 2. Plaintiff also complains that he went to Health Services on March 4, 2019 to get "documentation on my hands and ribs due to the incident on February 8th" but did not get a very good exam, and he felt the nurse was biased against him. ECF No. 1-7 at 7, 18.

Here, as noted *supra*, it appears that the medical staff at FCI Hazelton evaluated and provided treatment for Plaintiff's complaints regarding his wrists/hands on March 4, 2019 and March 30, 2020. Neither party has produced any other medical record showing any further issue with the wrist/hand issue. Moreover, there is nothing in the medical records produced by either party to show that Plaintiff ever reported having symptoms of a concussion, broken left rib or ribs, chemical burns and/or scarring on the right side of his body, bruising on his chest or legs, and/or PTSD, nor were any of the same ever documented upon exam by any Health Services provider. Plaintiff's complaint that "nurse Armell [sic]" only ordered testing on his left wrist and not his right was likely due to the findings of her exam, which documented some tenderness to the left hand and some swelling to the left wrist on exam, but full range of motion and no discernable injury on the right, beyond "healing abrasions to bilateral wrists" on March 4, 2019. ECF No. 27-1 at 2. Plaintiff's production of a copy of a March 30, 2020 Health Services exam by one Emmanuel Adams, MD, recommending a neurology consult for an EMG, citing the reason for the request as

> 48 yo male with h/o HTN, prediabetes and HLD. He has a c/o numbness on the dorsal surface of both hands x1 year after being restrained in handcuffs. *Reported his hands*

*became swollen and dusky purple when he was restrained.* Requesting EMG of b/l
UE to evaluate for nerve damage.

ECF No. 27-4 at 1 (emphasis added).  The undersigned notes that there is no documentation in the

contemporaneous records to support Plaintiff's claim to this physician, who saw him fourteen months

after the fact, that his hands were ever "swollen and dusky purple" while he was restrained for 10

hours on February 8, 2019; to the contrary; the contemporaneous records show otherwise. However,

because the EMG was never performed, it does not appear that there is any proof in the record that

this injury, like Plaintiff's alleged concussion, broken ribs, chemical burns, and PTSD are anything

more than Plaintiff's own self-diagnoses.

Nonetheless, the undersigned finds that Plaintiff's claims of concussion, fractured ribs,

chemical burns, wrist/hand neuropathy, and PTSD are complex medical issues which require that a

screening certificate of merit be filed.   In <u>Johnson v. United States</u>, 394 F.Supp.2d 854, 858 (S.D.

W.Va. 2005), the Court held that plaintiff's statement on his administrative claim form alleging

improper surgical implantation of a prosthesis satisfied the provisions of the MPLA permitting the

filing of a claim without submitting a certificate of merit. <u>Id.</u> The Court reasoned that plaintiff's claim

was based upon a well-established legal theory of liability and expert testimony was not required to

show a breach of the standard of care because plaintiff stated on his form that the surgeon "implanted

the too large Prosthesis backward causing diminished bloodflow and subsequent Necrosis and

infection." <u>Id.</u> at 858 (all spelling and punctuation errors in original).[27]

---

[27] <u>Johnson</u> is a rare exception to "the general rule that in medical practice cases negligence or  want of professional skill
can be proved only by expert witnesses." <u>See</u> <u>Banfi v. Am. Hosp. for Rehab.</u>, 529 S.E.2d 600, 605 (W.Va. 2000). A court
shall require expert testimony except where the "lack of care or want of skill is so gross, so as to be apparent, or the alleged
breach relates  to noncomplex matters of diagnosis and treatment within the understanding of lay jurors by  resort to
common knowledge and experience…" <u>Id.</u> at 605-606.

Unlike the facts in <u>Johnson</u>, Plaintiff's allegations of medical negligence are complex and expert testimony is necessary. See <u>O'Neil v. United States</u>, 2008 WL 906470 (S.D. W.Va. Mar. 31, 2008)(finding that plaintiff was not excused from filing a screening certificate of merit because the treatment and diagnosis of Graves disease, hyperthyroidism, congestive heart failure, and cardiomyopathy, are not within the understanding of lay jurors by resort to common knowledge and experience); <u>see also</u> <u>Lancaster v. Hazelton</u>, 2018 U.S. App. LEXIS 20836, *1 (4th Cir. Jul. 26, 2018) (*per curiam*) (affirming this court's dismissal of his FTCA medical negligence claims for his failure to file the required screening certificate of merit, pursuant to W. Va. Code § 55-7B-6(b) prior to filing his medical negligence claim).

Expert testimony is necessary to support any finding that the medical treatment provided by the staff at FCI Hazelton fell below the applicable standard of care. The undersigned finds that the symptoms, methods of prevention, and proper treatment options for neuropathy of the wrist/hands, concussion, broken ribs, chemical burns, and PTSD are not within the understanding of lay jurors by resort to common knowledge and experience. Further, neither is the alleged causal connection in the delay of the testing and the injuries alleged. Accordingly, Plaintiff is not excused from filing a screening certificate of merit pursuant to West Virginia Code § 55–7B–6(c) and any potential FTCA medical negligence claim against the United States' employees should be dismissed.

## V. <u>Recommendation</u>

Accordingly, for the foregoing reasons, the undersigned **RECOMMENDS** that the Defendant's Motion to Dismiss or in the Alternative, Motion for Summary Judgment [ECF No. 35], be **GRANTED** and that Plaintiff's Complaint [ECF No. 1] be **DENIED and DISMISSED with prejudice**.

Further, the undersigned **RECOMMENDS** that Plaintiff's pending letter motion to introduce evidence into case record [ECF No. 26] and Motion to Submit Medical Records into Evidence [ECF No. 27] be **GRANTED.** The undersigned also **RECOMMENDS** that Plaintiff's Motion for Summary Judgment in Favor of the Plaintiff . . . and Response [sic] to Declaration to Michael Moore [ECF No. 53] be **DENIED**, and that Plaintiff's pending Motion for Discovery [ECF No. 56] and Motion for the Defendant to Produce a Copy of Policy and Procedure for Video Retainment [ECF No. 54] be **DENIED as moot**, given that Plaintiff has either demonstrated that he already had access to the same or has already provided copies to the Court.

The parties are notified that this Report and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas S. Kleeh, United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), Rules 6(d) and 72(b), Federal Rules of Civil Procedure, and Rules 1(b) and 8(b) of the Rules Governing Proceedings in the United States District Courts Under Section 2254 of Title 28, United States Code, **any party shall have fourteen days from the date of service of this Report and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.**  Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12. Extension of this time period may be granted by the presiding District Judge for good cause shown.

**Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v.

Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).  A copy of such objections shall be served on Judge Kleeh.

The Clerk is directed to send a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to transmit a copy electronically to all counsel of record.

Upon entry of this Report and Recommendation, the clerk of court is **DIRECTED** to terminate the Magistrate Judge association with this case.

DATE: July 6, 2021

/s/ *Michael John Aloi*

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE